ASSOCIATED UTILITY CONTRAC-
TORS OF MARYLAND, INC.,
Plaintiff,

v.

The MAYOR AND CITY COUNCIL OF
BALTIMORE and Maryland Minority
Contractors Association, Inc., Defen-
dants.

No. CIV. AMD 98–4060.

United States District Court,
D. Maryland.

Feb. 16, 2000.

Robert Edward Gough, Maury S. Epner, Miller Miller & Canby, Rockville, MD, for Associated Utility Contractors of Maryland, Inc.

William R. Phelan, Jr., Law Dept., Baltimore, MD, Kathryn E. Kovacs, Baltimore City Law Dept., Baltimore, MD, for The Mayor and City Council of the City of Baltimore.

Adam Craig Harrison, Adam C. Harrison, PC, Towson, MD, Donna S. Mandl, Law Offices of Adam C. Harrison, P.C., Towson, MD, for Maryland Minority Contractors Association, Inc.

## MEMORANDUM

DAVIS, District Judge.

Plaintiff Associated Utility Contractors of Maryland, Inc. ("AUC") filed this action to challenge the continued implementation of the affirmative action program created by Baltimore City Ordinance 610, Balt. City Code §§ 217–226B ("the Ordinance"). The Ordinance was enacted in 1990 and authorizes the City to establish annually numerical set-aside goals applicable to a wide range of public contracts, including construction subcontracts.

After a limited period of discovery, AUC filed a motion for summary judgment,

which the City and intervening defendant Maryland Minority Contractors Association, Inc. ("MMCA") opposed. On December 17, 1999, I issued an order granting in part and denying in part the motion for summary judgment ("the December injunction"). Specifically, as to construction contracts entered into by the City, I enjoined enforcement of the Ordinance (and, consequently, continued implementation of the affirmative action program it authorizes) in respect to the City's 1999 numerical set-aside goals for Minority-and Women–Owned Business Enterprises ("MWBEs"), which had been established at 20% and 3%, respectively. I denied the motion for summary judgment as to the plaintiff's facial attack on the constitutionality of the Ordinance, concluding that there exists "a dispute of material fact as to whether the enactment of the Ordinance was adequately supported by a factual record of unlawful discrimination properly remediable through race- and gender-based affirmative action."

Although the December injunction contemplated that further discovery would be undertaken by the parties and that further proceedings would be necessary fully to adjudicate this case, in the present posture of the matter, I am persuaded that no further proceedings are necessary or appropriate in this case. I explain below the reason for the entry of the December injunction and the reasons I now conclude that no further proceedings are necessary or appropriate in this case in this court.

## I

The City has timely appealed the entry of the December injunction to the United States Court of Appeals for the Fourth Circuit. In addition, the City has filed before me, and plaintiff has opposed, a motion for stay of the injunction pursuant to Fed.R.Civ.P. 62(c). In support of the motion for stay, the City has disclosed the issues it will rely upon in what it contends will be a successful appeal. First, the City persists in its contention that AUC lacks organizational standing to challenge the Ordinance. For the reasons previously explained on the record and as elaborated upon herein, I am persuaded that plaintiff has satisfied the requirements for organizational standing as to the set-aside goals established by the City for 1999.

The City also seems to contend that (and apparently will seek vacation of the December injunction on appeal on the ground that) I erred in failing to forebear from the adjudication of this case and of the motion for summary judgment until after it had completed an alleged disparity study which, it contends, will establish a justification for the set-aside goals established for 1999. This curious argument seems to rest on the unarticulated notion that a governmental entity might permissibly adopt an affirmative action plan including set-aside goals and wait until such a plan is challenged in court before undertaking the necessary studies upon which the constitutionality of the plan depends. I am not aware of any legal support for such an approach, the City has not cited any such authority, and I am constrained to reject it.

As explained below, therefore, because the City has offered no contemporaneous justification for the 1999 set-aside goals it adopted on the authority of the Ordinance, I issued the December injunction and I shall decline to stay its effectiveness. Inasmuch as the December injunction awards complete relief to the plaintiff organization, and since any effort to adjudicate the issue of whether the City will adopt revised set-aside goals on the authority of the Ordinance is at present a wholly speculative undertaking, I shall dismiss this case without prejudice.

## II

In 1986, the City Council enacted in Ordinance 790 the first city-wide affirmative action set-aside goals, which required, *inter alia*, that for all City contracts, 20% of the value of subcontracts be awarded to Minority–Owned Business Enterprises

("MBEs") and 3% to Women–Owned Business Enterprises ("WBEs"). As permitted under then controlling Supreme Court precedent,[1] Ordinance 790 was justified by a finding that general societal discrimination had disadvantaged MWBEs. Apparently, no disparity statistics were offered to justify Ordinance 790.

After the Supreme Court announced its decision in *City of Richmond v. J.A. Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), the City convened a Task Force to study the constitutionality of Ordinance 790. The Task Force held hearings and issued a Public Comment Draft Report on November 1, 1989. It held additional hearings, reviewed public comments and issued its final report on April 11, 1990, recommending several amendments to Ordinance 790. The City Council conducted hearings, and in June 1990, enacted Ordinance 610, the law under attack in this case.

In enacting Ordinance 610, the City Council found that it was justified as an appropriate remedy of "[p]ast discrimination in the City's contracting process by prime contractors against minority and women's business enterprises...." Balt. City Code § 217(a). The City Council also found that "[m]inority and women's business enterprises ... have had difficulties in obtaining financing, bonding, credit and insurance;" that "[t]he City of Baltimore has created a number of different assistance programs to help small businesses with these problems ... [but that t]hese assistance programs have not been effective in either remedying the effects of past discrimination ... or in preventing ongoing discrimination." *Id.* § 217(c) & (d).

The operative section of Ordinance 610 relevant to this case mandates a procedure by which set-aside goals are to be established each year for minority and women owned business participation in City contracts. *Id.* § 219(a). The Ordinance itself does not establish any goals, but directs the Mayor to consult with the Chief of Equal Opportunity Compliance and "contract authorities" and to annually specify goals for each separate category of contracting "such as public works, professional services, concession and purchasing contracts, as well as any other categories that the Mayor deems appropriate." *Id.* The yearly goals must be "reasonable, achievable, and ..." based upon

(1) the existence and extent of past discrimination against minority and women's business enterprises on contracts awarded by the City and the likelihood of continuing discrimination if there were no annual goal;

(2) the level of participation of minority ... and women's business enterprises on past contracts awarded by the City which have contained minority and women's business enterprise requirements;

(3) the level of participation of minority ... and women's business enterprises on contracts awarded by other governmental agencies in the Baltimore area which have utilized minority and women's business enterprise requirements; and

(4) the availability of minority and women's business enterprises which are capable of providing the required goods and services.

*Id.* The Ordinance specifies that the Mayor must transmit the proposed goals to the Board of Estimates and the City Council, with thirty days notice before they become final. *Id.*

In 1990, upon its enactment of the Ordinance, the City established across-the-board set-aside goals of 20% MBE and 3% WBE for all City contracts with no variation by market. Thus, the record shows, without dispute, that the City simply readopted the 20% MBE and 3% WBE subcontractor participation goals from the prior law, Ordinance 790, which the Ordinance had specifically repealed. *Id.*

---

**1.** *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).

§ 217(g).[2] These same set-aside goals have been adopted without change and without factual support in each succeeding year since 1990. That is, the record shows, and the City does not dispute, notwithstanding the terms of the Ordinance, no annual study ever was undertaken to support the implementation of the affirmative action program generally or to support the establishment of any annual goals, and indeed, the City did not even collect the data which would have permitted such findings. No disparity study existed or was undertaken until the commencement of this law suit. Thus, the City had no reliable record of the availability of MWBEs for each category of contracting, and thus, as relevant to the case at bar, no way of determining whether its 20% and 3% goals were rationally related to extant discrimination (or the continuing effects thereof) in the letting of public construction contracts.

## III

■ AUC has established that it has associational standing to challenge the set-aside goals adopted by the City in 1999. Specifically, contrary to the City's contentions, based on the affidavit of Elaine Middleton, Executive Director of AUC; AUC's Answers to Interrogatories Nos. 2, 4, 15, and 16; and, the Baltimore City Certificates of Prequalification issued to several of AUC's members, plaintiff has sufficiently established that its members are "ready and able" to bid for City public works contracts. No more is required.

A litigant's standing to challenge a law is a critical component of the case or controversy requirement of Article III, and thus of this court's jurisdiction to hear the challenge. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), established a three part test for determining when "an association has standing to bring suit on behalf of it members ...:(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation in the lawsuit of the individual members...." *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434; *accord Friends of the Earth, Inc. v. Laidlaw Envtl. Services,* — U.S. —, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000); *see also Maryland State Conference of NAACP Branches v. Maryland Dept. of State Police,* 72 F.Supp.2d 560, 565 (D.Md.1999). The three prerequisites to associational standing described in *Hunt* are clearly satisfied here.

First, AUC must show that AUC's members, "or any one of them," *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), would otherwise have standing to sue in their own right. *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. In a "long line of cases" the Supreme Court has delineated three things that an individual must establish to obtain standing in her own right:

(1) injury in fact, by which we mean an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that

---

2. The Ordinance provided as follows, in pertinent part: "A general goal of this subtitle is to provide a narrowly tailored remedy for past discrimination, a goal that is advanced by deleting the overall twenty percent minority business enterprise and three percent women's business enterprise goals, substituting separate goals for different categories of contracts ... requiring regular review of the necessity for the provisions of this subtitle...." Balt. City Code § 217(g).

the injury will be redressed by a favorable decision, by which we mean that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative. These elements are the irreducible minimum required by the Constitution.

*Northeastern Florida Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 663–64, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)(internal quotations and citations omitted).

It is clear that AUC's members are disadvantaged by the goals in the bidding process, and this alone is a cognizable injury. For the purposes of an equal protection challenge to affirmative action set-aside goals the Supreme Court has held that the " 'injury in fact' is the inability to compete on an equal footing in the bidding process ..." *Northeastern Florida Chapter,* 508 U.S. at 666, 113 S.Ct. 2297; *see Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 211, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Thus the Court in *Northeastern Florida Chapter* held· that individual standing is established to challenge a set-aside program when a party demonstrates· "that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." 508 U.S. at 666, 113 S.Ct. 2297. The Court further held that once a party shows it is "ready and able" to bid in this context, the party will have sufficiently shown that the set-aside goals are "the 'cause' of its injury and that a judicial decree directing the city to discontinue its program would 'redress' the injury," thus satisfying the remaining requirements for individual standing. *Id.* at 666 & n. 5, 113 S.Ct. 2297.

Ample evidence that AUC members are "ready and able" to bid on City public works contracts is provided in several documents in the record. AUC's Answer to Interrogatory· 2 provides a list of AUC members. That several of these members have bid on city public works contracts and been awarded them during the years between 1990 and 1997 is evidenced by the City Equal Opportunity Compliance Office "MBE/WBE Participation by Contract Type" Detail Listings, which the parties have submitted as exhibits to their memoranda. In addition, the fact that various AUC members are currently "ready and able" to bid on City public works contracts is evidenced by the listing of those members' prequalification numbers in the AUC member list, and in copies of twelve AUC members' current "Certificate of Prequalification" attesting that these members are "prequalified to perform work in City of Baltimore projects" in various categories of public works construction. Pursuant to City of Baltimore Rules for Qualification of Contractors § 2.1, "[p]ossession of a valid Certificate of Prequalification is deemed proof of qualification" to bid on city contracts to perform work costing in excess of $25,000. Finally, the fact that AUC members who are "ready and able" to bid on City public works contracts are injured by the Ordinance is evidenced by the affidavit of Elaine Middleton, AUC's Executive Director, attesting to the fact that the twelve AUC members whose Certificates of Prequalification are in the record do not qualify as "Minority Group Members," "Minority Business Enterprise" or "Women's Business Enterprise" as defined in the Ordinance. Accordingly, these members are disadvantaged in the City public works contract bidding process, which privileges MWBE's as described above. Thus, members of AUC would have individual standing in their own right to challenge the constitutionality of the City's set-aside goals applicable to construction contracting, satisfying part one of the associational standing test.

The second part of the *Hunt* associational standing test requires AUC to demonstrate that "the interests it seeks to protect are germane to the organization's purpose." *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. AUC's purposes, as delineated in its constitution and bylaws, are " '[t]o combat unfair practices ·within' the public works segment of the construction indus-

try" and "to provide a means for members to 'avail themselves of the greater power and prestige of a united Association, acting as a ... representative in securing and establishing just, honorable, and equitable dealing and relationships with all contracting agencies ... in the State of Maryland.'" AUC Complaint (*quoting* AUC Const. Art. II, § 3; AUC Bylaws Art. I, § 2).[3] Clearly, any challenge to the continued implementation of set-aside goals, to the extent such public policy choices are disfavored by segments of the membership of AUC as "unfair," is "germane to the organization's purpose" as explicated by its membership and leadership.

Finally, part three of the *Hunt* test requires that "neither the claim asserted nor the relief requested requires the participation in the lawsuit of the individual members." *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. AUC's claims for declaratory and injunctive relief from what it believes to be unconstitutional set-aside goals do not necessitate "individualized proof and both are thus properly resolved in a group context." *Id.* at 344, 97 S.Ct. 2434. The relief which AUC seeks, to enjoin the City from enforcing the public works contracts set-aside provisions, would cure the injury which AUC's members assert they have suffered. *See International Union, United Auto v. Brock,* 477 U.S. 274, 288, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986)("[T]he UAW can litigate this case without the participation of those individual claimants and still ensure that 'the remedy, if granted, will inure to the benefit of those members of the association actually injured.'")(*quoting Warth v. Seldin,* 422 U.S. at 515, 95 S.Ct. 2197).

Thus, AUC has associational standing to challenge the constitutionality of the public works contracts set-aside provisions established in 1999 and this court has jurisdiction over this action. I find unpersuasive the City's repeated assertions, rooted in its reading of *Adarand* and *Suhre v. Haywood County,* 131 F.3d 1083 (4th Cir.1997), that plaintiff can only satisfy its burden to establish standing by the submission of an affidavit from one of its members containing an assertion of "an unmistakable intention" that that member will bid on a City construction contract "in the relatively near future."

## IV

AUC complains that since their initial promulgation in 1990, the City's set-aside goals have required AUC members to "select or reject certain subcontractors based upon the race, ethnicity, or gender of such subcontractors" in order to bid successfully on City public works contracts for work exceeding $25,000 ("City public works contracts"). AUC claims therefore that the City's set-aside goals violate the Fourteenth Amendment's guarantee of equal protection because they require prime contractors to engage in discrimination which the government itself cannot perpetrate. *See Norwood v. Harrison,* 413 U.S. 455, 465, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973)("It is axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.") (citation and internal quotations omitted). Government classifications based upon race and ethnicity are reviewed under strict scrutiny, *Adarand,* 515 U.S. at 227, 115 S.Ct. 2097; those based upon gender are reviewed under the less stringent intermediate scrutiny. *United States v. Virginia,* 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). I shall briefly review

---

**3.** AUC's complaint contains references to AUC's constitution and bylaws; however, the complaint is not verified and thus is not technically "evidence" before the court. Nevertheless, neither the City nor MMCA contest AUC's assertion of its organizational purposes. *See International Union, United Auto.* v. Brock, 477 U.S. 274, 286, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986)(relying upon provisions of the petitioner union's constitution as recited in the petitioner's brief on summary judgment to determine that the "interests that the UAW seeks to protect in this suit are 'germane to the organization's purpose.'").

the legal standards applicable to each category of classification in turn, and then explain why, in this case, those standards have not been satisfied by the City.

## A

The Fourteenth Amendment to the United States Constitution guarantees that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. It is now settled that "all laws that classify citizens on the basis of race [are] constitutionally suspect." *Shaw v. Hunt*, 517 U.S. 899, 904, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996). While such classifications are not illegal *per se*, they nevertheless are subjected to the most exacting legal scrutiny possible. "[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227, 115 S.Ct. 2097. That is, the government classification must be narrowly tailored to achieve a compelling government interest. *Croson*, 488 U.S. at 493–95, 109 S.Ct. 706. As the Fourth Circuit has explained:

> The rationale for this stringent standard of review is plain. Of all the criteria by which men and women can be judged, the most pernicious is that of race. The injustice of judging human beings by the color of their skin is so apparent that racial classifications cannot be rationalized by the casual invocation of benign remedial aims.... While the inequities and indignities visited by past discrimination are undeniable, the use of race as a reparational device risks perpetuating the very race-consciousness such a remedy purports to overcome.

*Maryland Troopers Ass'n, Inc. v. Evans*, 993 F.2d 1072, 1076 (4th Cir.1993) (citation omitted).

In *Croson*, a plurality of the Supreme Court concluded that state and local governments have a compelling interest in remedying identified past and present race discrimination within their borders. *Croson*, 488 U.S. at 492, 509, 109 S.Ct. 706. The plurality explained that the Fourteenth Amendment permits race-conscious programs that seek both to eradicate discrimination by the governmental entity itself, and to prevent the public entity from acting as a " 'passive participant' in a system of racial exclusion practiced by elements of the local construction industry" by allowing tax dollars "to finance the evil of private prejudice." *Id.* at 492, 109 S.Ct. 706.[4] Thus, *Croson* makes clear that the City has a compelling interest in eradicating and remedying *private discrimination* in the *private subcontracting* inherent in the letting of City construction contracts.

The Fourth Circuit has interpreted *Croson* to impose a "two step analysis for evaluating a race-conscious remedy." *Maryland Troopers Ass'n*, 993 F.2d at 1076. "First, the [government] must have a 'strong basis in evidence for its conclusion that remedial action [is] necessary....' 'Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are ... in fact motivated by illegitimate notions of racial inferiority or simple racial politics.' " *Id.* (*citing Croson*).

The second step in the *Croson* analysis is to determine whether the government has adopted programs that " 'narrowly tailor' any preferences based on race to meet their remedial goal." *Id.* The Fourth Cir-

---

**4.** In this respect, *Croson* rejected the view expressed in Justice Powell's plurality decision in *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), that government affirmative action can act only to remedy its own discrimination. *Id.* at 274, 106 S.Ct. 1842 (The Supreme Court "has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination."); *see* Ian Ayres & Frederick E. Vars, When Does Private Discrimination Justify Public Affirmative Action?, 98 *Columbia L.Rev.* 1577, 1582 (1998).

cuit summarized Supreme Court jurisprudence on "narrow tailoring" as follows:

> The preferences may remain in effect only so long as necessary to remedy the discrimination at which they are aimed; they may not take on a life of their own. The numerical goals must be waivable if qualified minority applications are scarce, and such goals must bear a reasonable relation to minority percentages in the relevant qualified labor pool, not in the population as a whole. Finally, the preferences may not supplant race-neutral alternatives for remedying the same discrimination.

*Id.* at 1076–77 (citations omitted).

## B

"Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *Virginia*, 518 U.S. at 531, 116 S.Ct. 2264. This burden is a "demanding [one] and it rests entirely on the State." *Id.* at 533, 116 S.Ct. 2264. Although gender is not "a proscribed classification," *id.*, in the way race or ethnicity is, the courts nevertheless "carefully inspect[ ] official action that closes a door or denies opportunity" on the basis of gender. *Id.* at 532. At bottom, a government wishing to discriminate on the basis of gender must demonstrate that its doing so serves "important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 533 (citations and quotations omitted); *Contractors Ass'n of Eastern Penn. v. Philadelphia*, 6 F.3d 990, 1001, 1009 (3d Cir.1993).

As with the standards for race-based measures, no formula exists by which to determine what evidence will justify every different type of gender-conscious measure. However, as the Third Circuit has explained, "[l]ogically, a city must be able to rely on less evidence in enacting a gender preference than a racial preference because applying *Croson's* evidentiary standard to a gender preference would eviscerate the difference between strict and intermediate scrutiny." *Contractors Ass'n,* 6 F.3d at 1010.

The Supreme Court has stated that an affirmative action program survives intermediate scrutiny if the proponent can show it was "a product of analysis rather than a stereotyped reaction based on habit." *Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547, 582–83, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990)(internal quotations omitted). The Third Circuit determined that "this standard requires the City to present probative evidence in support of its stated rationale for the [10% gender set-aside] preference, discrimination against women-owned contractors." *Contractors Ass'n,* 6 F.3d at 1010.

## C

In evaluating the first step of the *Croson* test, whether the City had a "strong basis in evidence for its conclusion that [race-conscious] remedial action was necessary," *Maryland Troopers Ass'n,* 993 F.2d at 1076, AUC argues that I must restrict my inquiry to evidence which the City actually considered before enacting the numerical goals. I agree.[5]

The Supreme Court holding in *Shaw* confirms that the plurality opinion in *Wygant* established the standard that *pre-enactment* evidence must provide the "strong basis in evidence" that race-based

---

5. Originally in its papers, AUC argued that the only evidence that would be admissible in this case would be "the evidence that was before the Baltimore City Council when it enacted [the numerical goals]" AUC's Memorandum of Law at 14. However, in its supplemental written submission after the hearing on November 5, 1999, AUC acknowledged that it would be appropriate to consider post enactment evidence for purposes of evaluating "narrow tailoring." The *Croson* "strong evidence" standard requires evaluation of only preenactment evidence; however, inquiry about the efficacy of race neutral alternatives and about whether the affirmative action is narrowly tailored can appropriately include consideration of post-enactment evidence.

remedial action is necessary. In *Wygant,* the plurality opinion, joined by four justices including Justice O'Connor, held that a state entity "must ensure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination." *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842 (*cited with approval in Shaw,* 517 U.S. at 910, 116 S.Ct. 1894).[6] Because of this controlling precedent, I am compelled to analyze the evidence before the City when it adopted the 1999 set-aside goals specifying the 20% MBE participation in City construction subcontracts. For analogous reasons, the three percent WBE preference must also be justified by preenactment evidence.

■ In this case, that task is extraordinarily simple. It is undisputed here that the City considered *no evidence in 1999* before promulgating the construction subcontracting set-aside goals of 20% for MBEs and 3% for WBEs.[7] Confronted with a sheer absence of any record of what evidence the City considered prior to promulgating the set-aside goals for 1999, there is simply no dispute of material fact foreclosing summary judgment in favor of plaintiff. It is thus clear, as a matter of law, that the 20% preference is not supported by a "strong basis in evidence" showing a need for a race-conscious remedial plan in 1999; nor is the three percent preference shown to be "substantially related to achievement" of the important objective of remedying gender discrimination in 1999, in the construction industry in Baltimore.

The City has repeatedly asserted throughout this case that this court should uphold the set-aside goals based upon sta-

6. The Fourth Circuit has not ruled on the issue whether affirmative action measures must be justified by a strong basis in preenactment evidence. In its decisions invalidating state affirmative action policies in *Podberesky v. Kirwan,* 38 F.3d 147 (4th Cir.1994), and *Maryland Troopers Ass'n, Inc. v. Evans,* 993 F.2d 1072 (4th Cir.1993), the Court apparently relied without comment upon post enactment evidence when evaluating the policies for *Croson* "strong basis in evidence." *Podberesky,* 38 F.3d at 154 (referring to post enactment surveys of African–American students at College Park campus); *Maryland Troopers,* 993 F.2d at 1078 (evaluating statistics about the percentage of black troopers in 1991 when deciding whether there was a statistical disparity great enough to justify the affirmative action measures in a 1990 consent decree). However, this issue was apparently not raised in these cases, and both were decided before the 1996 Supreme Court decision in *Shaw v. Hunt,* 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207, which clarified that the *Wygant* plurality decision was controlling authority on this issue.

Three courts had held, prior to *Shaw,* that post enactment evidence may be relied upon to satisfy the *Croson* "strong basis in evidence" requirement. *Concrete Works of Colorado, Inc. v. Denver,* 36 F.3d 1513 (10th Cir. 1994), *cert. denied,* 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995); *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo,* 981 F.2d 50, 60 (2d Cir.1992); *Coral Construction Co. v. King County,* 941 F.2d 910 (9th Cir.1991), *cert. denied,* 502 U.S. 1033, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992). In addition, the Eleventh Circuit held in 1997 that "post enactment evidence is admissible to determine whether an affirmative action program" satisfies *Croson. Engineering Contractors Ass'n of South Florida, Inc. v. Metropolitan Dade County,* 122 F.3d 895, 911–12 (11th Cir.1997), *cert. denied,* 523 U.S. 1004, 118 S.Ct. 1186, 523 U.S. 1004 (1998). However, that decision does not consider *Hunt* and instead relies upon the reasoning in *Ensley Branch, NAACP v. Seibels,* 31 F.3d 1548, 1565–66 (11th Cir.1994), a pre-*Hunt* case. *Engineering Contractors,* 122 F.3d at 911 ("Without repeating everything we had to say in *Ensley Branch* on this subject ..."). Because I believe that *Shaw* and *Wygant* provide controlling authority on the role of post enactment evidence in the "strong basis in evidence" inquiry, I do not find these decisions persuasive on this point. *See West Tennessee Chapter of Assoc. Builders & Contractors, Inc. v. Board of Ed. of the Memphis City Schools,* 64 F.Supp.2d 714 (W.D.Tenn.1999).

7. I do not understand the City to suggest that the 10–year–old evidence before the City Council upon the enactment of the Ordinance in 1990 might serve to justify the 1999 goals. *See Maryland Troopers Ass'n,* 993 F.2d at 1076–77.

tistics which the City *is now in the process of gathering* in a disparity study it has commissioned. However, the City has not provided any legal support for the proposition that a governmental entity might permissibly adopt an affirmative action plan including set-aside goals and wait until such a plan is challenged in court before undertaking the necessary studies upon which the constitutionality of the plan depends. Moreover, the current study is not even complete as of the date of this Memorandum. It clearly could not have produced data upon which the City actually relied in establishing the set-aside goals for 1999.

I commend the City for beginning to collect and analyze the data which the City Council directed it to begin collecting annually back in 1990, when the Ordinance was enacted. Presuming the data this study produces are reliable and complete, the City could soon have the statistical basis upon which to make the findings Ordinance 610 requires, and which could satisfy the constitutionally required standards for the promulgation and implementation of narrowly tailored set-aside race— and gender conscious goals.

Nonetheless, as the record stood when I entered the December injunction and as it stands today, there are no data in evidence showing a disparity, let alone a gross disparity, between MWBE availability and utilization in the subcontracting construction market in Baltimore City. Indisputably, the City possessed no such evidence when it established the 1999 set-aside goals challenged in this case. A percentage set-aside measure, like the MWBE goals at issue here, can only be justified by reference to the overall availability of minority- and women-owned businesses in the relevant markets. In the absence of such figures, the 20% MBE and 3% WBE set aside figures are arbitrary and clearly unenforceable in light of controlling Supreme Court and Fourth Circuit authority.

## V

For the reasons set forth herein, I entered the injunction on December 17, 1999 and it remains fully in effect. Furthermore, in the present posture of this case, which is now pending in the United States Court of Appeals for the Fourth Circuit upon the City's timely appeal, further litigation here is unwarranted as plaintiff has received from this court—in the December injunction—all of the relief to which it is presently entitled. Accordingly, the motion for stay of order shall be denied and this action shall be dismissed without prejudice.