**ASSOCIATED UTILITY CONTRACTORS OF MARYLAND, INC, Plaintiff,**

v.

**The MAYOR AND CITY COUNCIL OF BALTIMORE, Defendant.**

No. CIV. AMD–01–1508.

United States District Court, D. Maryland.

Sept. 9, 2002.

See also, 2000 WL 432757.

Robert Edward Gough, Maury S. Epner, Miller Miller and Canby, Rockville, MD, for Plaintiff.

William R. Phelan, Jr., Thurman W. Zollicoffer, Jr., Dan Friedman, Saul Ewing LLP, LTina Burse Greene, Baltimore, MD, for Defendant.

## MEMORANDUM

DAVIS, District Judge.

Plaintiff Associated Utility Contractors of Maryland, Inc. ("AUC"), filed this action against defendant Mayor and City Council of Baltimore ("the City") on or about May 23, 2001, to challenge the implementation of the public contracting affirmative action program created by Baltimore City Ordinance 00–98 and a related mayoral executive order ("the Executive Order"). Ordinance 00–98 became law upon the Mayor's approval of City Council Bill 00–0211 on November 28, 2000. Now pending is the City's motion to dismiss AUC's amended complaint, in which the City argues that AUC lacks representational standing to mount a facial challenge to Ordinance 00–98, and that AUC both lacks standing and has failed to state a claim as to its "as applied" challenge to the Executive Order. The issues have been fully briefed and I have conducted two oral hearings. The motion to dismiss shall be denied for the reasons stated below.

### I.

In an earlier case, *Associated Utility Contractors of Maryland, Inc. v. Mayor and City Council of Baltimore*, 83 F.Supp.2d 613 (D.Md.2000), AUC challenged the constitutionality under the Equal Protection Clause of the City's affirmative action plan which had been created under a predecessor law to Ordinance 00–98. Under that earlier affirmative action plan, the City had mandated across-the-board subcontractor set asides of 20% and 3%, covering minority business enterprises and women's business enterprises, respectively, seeking work as subcontractors on a sizeable percentage of City public works contracts in 1999. I declared that affirma-

tive action plan unconstitutional, reasoning as follows in part:

[A] state entity must ensure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination. . . . I am compelled[, therefore] to analyze the evidence before the City when it adopted the 1999 set-aside goals specifying the 20% MBE [minority business enterprise] participation in City construction subcontracts. For analogous reasons, the three percent WBE [women's business enterprise] preference must also be justified by preenactment evidence.

In this case, that task is extraordinarily simple. It is undisputed here that the City considered *no evidence in 1999* before promulgating the construction subcontracting set-aside goals of 20% for MBEs and 3% for WBEs. Confronted with a sheer absence of any record of what evidence the City considered prior to promulgating the set-aside goals for 1999, there is simply no dispute of material fact foreclosing summary judgment in favor of plaintiff. It is thus clear, as a matter of law, that the 20% preference is not supported by a "strong basis in evidence" showing a need for a race-conscious remedial plan in 1999; nor is the three percent preference shown to be "substantially related to achievement" of the important objective of remedying gender discrimination in 1999, in the construction industry in Baltimore.

The City has repeatedly asserted throughout this case that this court should uphold the set-aside goals based upon statistics which the City *is now in the process of gathering* in a disparity study it has commissioned. However, the City has not provided any legal support for the proposition that a governmental entity might permissibly adopt an affirmative action plan including set-aside goals and wait until such a plan is challenged in court before undertaking the necessary studies upon which the constitutionality of the plan depends. Moreover, the current study is not even complete as of the date of this Memorandum. It clearly could not have produced data upon which the City actually relied in establishing the set-aside goals for 1999.

*Id.* at 621–22 (citations, internal quotations, and footnotes omitted). Ordinance 00–98 is allegedly based on the studies which the City had commenced while the earlier case was pending. Specifically, Ordinance 00–98 repealed the ordinance on which the prior affirmative action plan was based, Balt. City Code §§ 217–226B (repealed), and authorized the affirmative action plan now under attack.

Without regard to whether it does or does not pass constitutional muster under the Equal Protection Clause, it cannot be denied that the affirmative action plan authorized by Ordinance 00–98 (a copy of which is attached to the complaint and incorporated by reference into the amended complaint) differs in significant respects from the City's prior affirmative action plan. Whereas under the prior ordinance, the City simply declared across-the-board set aside percentages for all City public works contracts, the present affirmative action plan strives for a far more nuanced approach.

Specifically, Ordinance 00–98 requires the City's Minority and Business Women's Opportunity Office (the "MWBOO") to set, on a contract-by-contract basis, Minority and Women's Business Enterprise ("M/WBE") contract participation goals that are "flexible and rationally related to the disparity identified in the City's contracting markets." Section 28–3(A). In setting

the goals on an individual contract, the MWBOO must consider:

(1) The availability in various industry classifications and professions of MBEs and WBEs that are qualified and willing to provide goods, expertise, and services on the particular contract;

(2) The level of utilization of those firms in past contracts awarded by the City;

(3) The contract specifications;

(4) The adverse impact on non-MBEs and -WBEs; and

(5) Any other relevant factors.

Section 28–22(A). In addition, Ordinance 00–98 specifies that "for a goal to be applicable to a contract, at least 2 MBEs or WBEs must be available for that goal." Section 28–22(B). Thus, under Ordinance 00–98, whether any M/WBE participation goals will apply, and if so, what those goals will be, is determined on a contract-by-contract, and apparently a craft-by-craft basis.

Significant enforcement provisions are included in the existing affirmative action plan. Specifically, a bidder's failure to commit to utilizing M/WBEs as subcontractors in accordance with the contract-specific racial, ethnic, and gender preferences imposed by the MWBOO renders the bid nonresponsive. Section 28–48(B)(2). A successful bidder (prime contractor or subcontractor) on a contract which requires M/WBE participation goals, who fails to comply with Ordinance 00–98 is subject to a host of penalties, including disqualification from performing City contracts for up to two years and the imposition of monetary sanctions. Section 28–96.

## II.

■ As it did in the prior case, the City raises in the case at bar the issue of whether AUC, the sole plaintiff, has representational standing to mount a facial challenge to the affirmative action plan authorized by Ordinance 00–98. The City relies primarily on the existence of the' significant differences between the operational details of the prior affirmative action plan, on the one hand, and the contract-by-contract approach, among other features, created in the existing plan. AUC contends that, for purposes of its representational standing, the differences between the prior plan and the existing plan are irrelevant, *see Lutheran Church–Missouri Synod v. FCC,* 141 F.3d 344, 354 (D.C.Cir.), *reh'g denied,* 154 F.3d 487 (D.C.Cir.), and *reh'g en banc denied,* 154 F.3d 494 (D.C.Cir. 1998) ("Although it was urged that … 'goals' should be treated differently than obligatory set asides … we do not think it matters whether a government hiring program imposes hard quotas, soft quotas, or goals. Any one of these techniques induces an employer to hire with an eye toward meeting the numerical target. As such, they can and surely will result in individuals being granted a privilege because of their race."), and that its representational standing in the case at bar is equally as obvious as it was in the prior litigation.

In finding that AUC had representational standing in the earlier case, I reasoned as follows, in part:

A litigant's standing to challenge a law is a critical component of the case or controversy requirement of Article III, and thus of this court's jurisdiction to hear the challenge. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), established a three part test for determining when "an association has standing to bring suit on behalf of it members …: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the

organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation in the lawsuit of the individual members...." *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434; *accord Friends of the Earth, Inc. v. Laidlaw Envtl. Services,* 528 U.S. 167, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000); *see also Maryland State Conference of NAACP Branches v. Maryland Dept. of State Police,* 72 F.Supp.2d 560, 565 (D.Md.1999)....

AUC must show that AUC's members, "or any one of them," *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), would otherwise have standing to sue in their own right. *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. In a "long line of cases" the Supreme Court has delineated three things that an individual must establish to obtain standing in her own right:

> (1) injury in fact, by which we mean an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative. These elements are the irreducible minimum required by the Constitution.

*Northeastern Florida Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 663–64, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (internal quotations and citations omitted).

It is clear that AUC's members are disadvantaged by the goals in the bidding process, and this alone is a cognizable injury. For the purposes of an equal protection challenge to affirmative action set-aside goals the Supreme Court has held that the " 'injury in fact' is the inability to compete on an equal footing in the bidding process...." *Northeastern Florida Chapter,* 508 U.S. at 666, 113 S.Ct. 2297; *see Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 211, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Thus the Court in *Northeastern Florida Chapter* held that individual standing is established to challenge a set-aside program when a party demonstrates "that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." 508 U.S. at 666, 113 S.Ct. 2297. The Court further held that once a party shows it is "ready and able" to bid in this context, the party will have sufficiently shown that the set-aside goals are "the 'cause' of its injury and that a judicial decree directing the city to discontinue its program would 're-dress' the injury," thus satisfying the remaining requirements for individual standing. *Id.* at 666 n. 5.

Ample evidence that AUC members are "ready and able" to bid on City public works contracts is provided in several documents in the record.... Accordingly, these members are disadvantaged in the City public works contract bidding process, which privileges MWBE's as described above. Thus, members of AUC would have individual standing in their own right to challenge the constitutionality of the City's set-aside goals applicable to construction contracting, satisfying part one of the associational standing test.

The second part of the *Hunt* associational standing test requires AUC to

demonstrate that "the interests it seeks to protect are germane to the organization's purpose." *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434.... Clearly, any challenge to the continued implementation of set-aside goals, to the extent such public policy choices are disfavored by segments of the membership of AUC as "unfair," is "germane to the organization's purpose" as explicated by its membership and leadership.

Finally, part three of the *Hunt* test requires that "neither the claim asserted nor the relief requested requires the participation in the lawsuit of the individual members." *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. AUC's claims for declaratory and injunctive relief from what it believes to be unconstitutional set-aside goals do not necessitate "individualized proof and both are thus properly resolved in a group context." *Id.* at 344, 97 S.Ct. 2434. The relief which AUC seeks, to enjoin the City from enforcing the public works contracts set-aside provisions, would cure the injury which AUC's members assert they have suffered. *See UAW v. Brock,* 477 U.S. 274, 288, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) ("[T]he UAW can litigate this case without the participation of those individual claimants and still ensure that 'the remedy, if granted, will inure to the benefit of those members of the association actually injured.' ") (quoting *Warth v. Seldin,* 422 U.S. at 515, 95 S.Ct. 2197).

Thus, AUC has associational standing to challenge the constitutionality of the public works contracts set-aside provisions established in 1999 and this court has jurisdiction over this action.

83 F.Supp.2d at 616–18.

### III.

In the case at bar, I am not so sanguine about AUC's standing, as there are at least two seeming deficiencies in AUC's standing that were not evident in the prior litigation. First, it seems that whether the above reasoning supports the conclusion that AUC has representational standing in this case is problematic because the nature of the claim and relief sought in respect to the affirmative action plan under attack, unlike the affirmative action plan under attack in the prior case, arguably "requires the participation in the lawsuit of the individual members" of AUC. Thus, AUC seemingly fails to satisfy the third prong of the *Hunt* representational standing test under the circumstances of this case.

The across-the-board set aside requirements which were core aspects of the City's prior affirmative action plan—and which was a critical attribute of the set aside program involved in *Northeastern Florida Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 663–64, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), plainly did not require the participation of AUC members in the adjudication of that case. In contrast, again without regard to whether the new affirmative action plan will survive strict scrutiny, it is seemingly impossible to adjudicate the question of the constitutionality of the existing plan in the abstract and without the significant participation of actual contractors having participated in the processes mandated by the ordinance. Significantly, for example, Ordinance 00–98 provides that no minority or women's business enterprise goal will be established for some contracts, and specifically provides that if at least two qualified MWBEs are not available, then no goal will be set.

Nevertheless, there is very little elaboration in the cases concerning the application of the third prong of the *Hunt* test in the context of equal protection challenges to governmental affirmative action plans. At one extreme, courts have seemingly deemed the third *Hunt* requirement satis-

fied so long as the relief sought is limited to declaratory and/or injunctive relief. *See, e.g., Associated Gen. Contractors of California, Inc. v. Coalition for Econ. Equity,* 950 F.2d 1401, 1408–09 (9th Cir. 1991). In contrast, the Fourth Circuit has found that the third *Hunt* requirement is not satisfied, and that representational standing is lacking, at least where there may exist a conflict of interest among members of the organization seeking representational standing. *See Maryland Highways Contractors Assoc. v. Maryland,* 933 F.2d 1246, 1253 (4th Cir.), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991); *Maryland Minority Contractor's Assoc., Inc. v. Maryland Stadium Auth.,* 70 F.Supp.2d 580, 590 (D.Md. 1998), *aff'd,* 198 F.3d 237 (4th Cir.1999) (finding no organizational standing when some members would benefit from the statute and there was no "indication of how the decision to attack the ... statute was made, or of how much support for the suit exists within the membership...."); *see also NAACP v. City of Annapolis,* 133 F.Supp.2d 795, 808, 802–03 (D.Md.2001) (finding no disqualifying conflict of interest sufficient to undermine representational standing in First Amendment context). *Cf. Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs.,* 280 F.3d 278, 286 (3rd Cir.2002) ("If the Pennsylvania Psychiatric Society can establish [claims for prospective injunctive relief] with limited individual participation, it would satisfy the requirements for associational standing. While we question whether the Society can accomplish this, at this stage of the proceedings on a motion to dismiss for lack of standing, we review the sufficiency of the pleadings and 'must accept as true all material allegations of the complaint and must construe the complaint in favor of the plaintiff....' For this reason, we believe the Society's suit should not be dismissed before it is given the opportunity to establish the alleged violations without signifi-

cant individual participation." (citations omitted)). Certainly, no case has been brought to my attention in which a court was called upon to determine representational standing in respect to a challenge to a plan whose constitutionality under strict scrutiny review will require the kind of fact-intensive inquiry it seems will be necessary in this case. *See id.* ("We agree that conferring associational standing would be improper for claims requiring a fact-intensive-individual inquiry.").

Second, apart from concern over whether AUC has satisfied the third prong of the *Hunt* representational standing test, the City has focused on the first prong of the *Hunt* test, namely, whether any members of AUC "would otherwise have standing to sue in their own right." The City contends, in short, that in view of the highly fact-based nature of the contract-by-contract goal-setting process set out in Ordinance 00–98, as a matter of law, the fear of injury asserted by AUC's members is too conjectural and speculative to satisfy *Hunt's* incorporation of the ordinary standing requirement of an "injury in fact" which is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *See Northeastern Florida Chapter of the Assoc. Gen. Contractors of Am.,* 508 U.S. at 663–64, 113 S.Ct. 2297. This contention is not without some force. Indeed, to the extent that AUC seeks to rest its argument that it has satisfied the "imminent injury" requirement on the possibility that one of its prime contractor members is at risk of being sued by one of its subcontractor members for complying with the City's affirmative action plan, the claim is utterly laughable and manifestly hypothetical. In the decade of its members' experience with the plainly unconstitutional prior affirmative action plan, AUC has not reported a single instance of such a suit or even a threat of such a suit.

Despite these seeming deficiencies, which are only minimally addressed by AUC's filing of an amended complaint supplemented by affidavits of several of its members, and despite AUC's obstinate refusal to have at least one of its members join this lawsuit, I am mindful of the legal context in which AUC's claims have been asserted. To be sure, no moderately-informed person paying even casual attention to the contemporary public discourse on the role of race and gender in the distribution of governmental benefits would deny that the era of race- and gender-based remedial programs is fast coming to an end and that widespread popular and judicial antipathy to affirmative action is driving a public policy, and a constitutional jurisprudence, aimed at seeing that the end of the era arrives sooner rather than later. *See generally* Peter H. Schuck, *Affirmative Action: Past, Present, and Future*, 20 YALE L. & POL'Y REV. 1 (2002). Even so, although that day is fast approaching, it has not yet arrived, *see Grutter v. Bollinger*, 288 F.3d 732 (6th Cir.2002) (en banc) (sustaining program using race in the admission of students to the University of Michigan School of Law); *Reynolds v. City of Chicago*, 296 F.3d 524 (7th Cir.2002) (affirming jury verdict in favor of city sued by white police officers for "out of rank" promotions of minorities and women pursuant to affirmative action program), and it would appear that even in an environment in which courts seem always to be open to anti-affirmative action litigation, *conventional notions of standing still matter. See Farmer v. Ramsay*, 159 F.Supp.2d 873, 886 (D.Md.2001) (finding that unsuccessful white applicant to medical school lacked standing to obtain prospective injunctive relief to forbid the use of race in admissions), *aff'd*, 2002 WL 1766615, *5–*6, 43 Fed.Appx. 547 (4th Cir. 2002); *but see Eng' Contractors Assoc. of S. Florida, Inc. v. Metro. Dade County*, 122 F.3d 895, 906 (11th Cir.1997) ("When

the government loads the dice [by implementing an affirmative action program], the Supreme Court says that anyone in the game has standing to raise a constitutional challenge."), *cert. denied sub nom., Allied Minority Contractors Assoc., Inc. v. Eng' Contractors Assoc. of S. Florida, Inc.*, 523 U.S. 1004, 118 S.Ct. 1186, 140 L.Ed.2d 317 (1998). If "the game" is broadly defined as the community of interests arrayed against contemporary affirmative action plans, then undoubtedly, AUC and its counsel may assume the role, as they have, of roving equal protection police for Baltimore City. *See* Pl.'s Supp.Mem. in Opp. to Def.'s Mot. to Dis. at 10, 11 ("*We* sincerely hope that the foregoing satisfies the Court....; *[W]e* do not believe there is anything further ... that *we* can provide to the Court on this subject; *[W]e* request that the Court grant the City's Motion and that it do so expeditiously. *We* will then note an appeal and ask the Fourth Circuit to determine whether *we* or the Court has the better of this particular argument.") (emphases added); Pl.'s Resp. to Def.'s Supp.Mem. at 5, 8 ("In *our* Supplemental Brief....; *We* do, however, wish to bring to the court's attention....; *we* believe *we* have demonstrated ... that the AUC enjoys standing....; In the event the Court remains of the view that the AUC lacks standing, *we* request that the Court grant the City's Motion and that it do so expeditiously.") (emphases added).

At bottom, I am cognizant that I have a continuing obligation to examine plaintiff's standing. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'") (quoting *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)); *Friends of the Earth, Inc. v. Laidlaw*

*Envt'l. Servs.*, 528 U.S. 167, 201, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("As we have previously recognized, an initial conclusion that plaintiffs have standing is subject to reexamination, particularly if later evidence proves inconsistent with that conclusion.") (Scalia, J., dissenting). I will carry out that responsibility, as I will attend to all of my responsibilities, as the case goes forward. For now, it is appropriate to permit the case to proceed to the next stage, notwithstanding my strongly held view that, in light of the apparent nature of the affirmative action plan being challenged here, quite apart from the question of whether it passes constitutional muster, AUC, in contrast, perhaps, to some of its members, is "among the 'abstractedly distressed,' not the 'truly afflicted.'" *Farmer*, 159 F.Supp.2d at 886 (quoting *Friends of the Earth v. Gaston Copper Recycling*, 204 F.3d 149, 154 (4th Cir.2000) (en banc)).

## IV.

Under the circumstances presented here, I think it is also prudent to permit count two to remain in the case. Prior to the enactment of Ordinance 00–98, Mayor Martin O'Malley issued an Executive Order dated September 14, 2000. It announced a goal of awarding 35% of all City contracting dollars to minority-owned and women-owned businesses. Clearly, the goal of 35% participation is aspirational only and the Executive Order contains no enforcement mechanism or penalties for non-compliance. The Executive Order also specified numerous noncoercive outreach measures to be taken by City agencies to solicit bids from minority and women-owned businesses, such as advertising bids in minority-owned media, contacting minority and women oriented trade associations, subdividing contracts to enable bidding by smaller businesses, keeping statistics, and paying contractors and subcontractors in a timely manner. Again, these measures were merely aspi-

rational with no enforcement mechanism provided. *E.g.*, Executive Order at 3 ("All City agencies ... shall make every good faith effort to equitably utilize the services of minority business enterprises and women's business enterprises.").

AUC seeks a declaration that the Executive Order violates the Fourteenth Amendment and an injunction against its "enforcement." AUC alleges that the "Executive Order requires that its 35% M/WBE set-aside be reflected in provisions to be included in '[a]ll contracts or other agreements between' the City and other 'governmental agencies, quasi-governmental agencies, developers, or any other parties' which 'receive money from or through the City for the purpose of contracting with businesses to perform public works....'" Am.Compl. at ¶ 40. AUC also alleges that

> [s]ince the issuance of the Executive Order, the City of Baltimore Development Corporation ("BDC"), the City's agent for soliciting, negotiating and administering contracts with developers and other 'parties' described in the preceding paragraph, has required developers and other 'parties' with whom it contracts, as a condition of award of such contracts and of receipt of fiscal assistance from the City, to utilize minority business enterprises for 30% of the dollar value of the work to be performed on their respective projects(s) and to utilize women-owned business enterprises for an additional 5% of the total dollar value of the work to be performed on their respective project(s), or in other specified percentages intended to achieve the Executive Order's 35% contracting quota.

Am.Compl. at ¶ 41.

Clearly, the wording of the Executive Order is "precatory and imposes no substantive restrictions." *Webster v. Reprod.*

*Health Servs.*, 492 U.S. 490, 505, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). On its face, it imposes no "requirements" and creates no sanctions. Its mere existence does not inflict an injury upon any member of AUC in any concrete way and thus does not create a "case or controversy." *See id.*

AUC also alleges, however, that the City is *applying* the Executive Order to require contractors to comply with the 35% M/WBE goal in order to be awarded City contracts. This "as applied" challenge does state a claim upon which relief can be granted. *See id.* at 506, 109 S.Ct. 3040 ("It will be time enough for federal courts to address the meaning of the preamble [declaring that life begins at conception] should it be applied to restrict the activities of appellees in some concrete way."). Moreover, it would seem that AUC has representational standing to assert this "as applied" challenge for the same reasons it had standing to challenge the prior affirmative action plan. In other words, reading the allegations in the light most favorable to AUC, it appears that the claim is that the City is implementing the Executive Order to require that all contract bids include 35% M/WBE participation. Thus, consistent with my reasoning in the prior litigation, AUC's members' readiness to bid on City contracts and their stated intent to bid on future contracts subject to the Executive Order places them in the same position they were in when AUC challenged the prior affirmative action plan. *See* 83 F.Supp.2d at 617. Whether AUC will be able to marshal sufficient evidence that the City has in fact applied the Executive Order, or continues to apply the Executive Order, in the manner alleged, such that declaratory or prospective injunctive relief is warranted, is not appropriately resolved on a motion to dismiss.

## V.

For the reasons stated, the motion to dismiss shall be denied. An order follows.

## ORDER

In accordance with the foregoing Memorandum, it is this 4th day of September, 2002 by the United States District Court for the District of Maryland ORDERED

(1) That the motion of the Mayor and City Council of Baltimore to dismiss (Paper No. 11) is DENIED; and it is further ORDERED

(2) That defendant shall answer the amended complaint on or before September 30, 2002; and it is further ORDERED

(3) That the Clerk shall TRANSMIT copies of this Order and the foregoing Memorandum to counsel of record.