**NORTH CAROLINA MOTORCOACH ASSOCIATION, on behalf of its members, and McGill, Inc. d/b/a Carolina American Tours, Plaintiffs,**

v.

**GUILFORD COUNTY BOARD OF EDUCATION, Defendant.**

No. 1:02 CV 227.

United States District Court, M.D. North Carolina.

April 27, 2004.

Tamura D. Coffey, Paul J. Smith, Wilson & Iseman, L.L.P., Winston–Salem, NC, for Plaintiff.

Jill R. Wilson, Clinton R. Pinyan, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, for Defendant.

*MEMORANDUM OPINION*

BEATY, District Judge.

■  This action is before the Court on Defendant Guilford County Board of Education's ("Board") Motion to Dismiss and to Strike [Document # 5]. Plaintiffs North Carolina Motorcoach Association ("NCMA") and McGill, Inc. d/b/a Carolina American Tours ("Carolina American") (collectively "Plaintiffs") have alleged various claims under federal and state law. Plaintiffs' federal claims include allegations that Defendant has violated both the Supremacy Clause and the Commerce Clause of the United States Constitution. Plaintiffs' state-law claims include the following: (1) tortious interference with contract, (2) tortious interference with prospective economic advantage, and (3) illegal use of school activity buses in violation of North Carolina General Statutes sections 66–58(c)(9a) and 115C–247. Pursuant to their tortious-interference claims, Plaintiffs seek punitive damages against Defendant. With respect to their claim that Defendant is illegally using school activity buses, the Court notes that Plaintiffs abandoned this claim at the hearing this Court held on March 19, 2004 (hereinafter "Motion Hearing"). Therefore, Plaintiffs' claim alleging illegal use of school activity buses is dismissed with prejudice and will not be discussed further in this Opinion.[1]

1. At the Motion Hearing, the Court asked Plaintiffs' counsel whether it was appropriate for this Court to determine whether Defendant had violated North Carolina General Statutes sections 66–58(c)(9a) and 115C–247. In response, Plaintiffs' counsel responded as follows: "Your Honor, I do not wish to be heard further on that claim." (Mot. Hr'g Tr.) Based on this response, the Court deems Plaintiffs to have abandoned this claim. The Court further notes that even if Plaintiffs were still pursuing this claim, the Court has reviewed the claim and has determined that North Carolina law does not provide a private right of action allowing citizens to compel school boards' compliance with the provisions of sections 115C–247 or 66–58(c)(9a), which provides that a violation of 115C–247

## I. FACTUAL AND PROCEDURAL BACKGROUND

Viewing the allegations in the light most favorable to Plaintiffs, as this Court must do when ruling on a motion to dismiss, Plaintiffs make the following allegations. Plaintiff NCMA, a nonprofit, North Carolina corporation, is a trade association composed of North Carolina motor carriers as well as entities and persons (both in and out of North Carolina) with an interest in tourism. Plaintiff Carolina American, a member of NCMA, is a North Carolina corporation that operates motorcoaches for passenger transportation and other tourism-related activities in North Carolina. Defendant Board is established and operated pursuant to North Carolina General Statutes sections 115C–35 to 115C–50, and is vested with the general control and supervision of the public schools in Guilford County. NCMA has filed this action against Defendant in a representative capacity on behalf of its members who have been or will be harmed by the alleged wrongful conduct of Defendant. Carolina American has filed this action against Defendant in Carolina American's individual capacity.

In June 2000, the Department of Public Instruction, an administrative subdivision of the North Carolina State Board of Education, formed the School Charter Transportation Safety Committee ("Committee"). The Committee's purpose was to study and formulate guidelines and procedures to ensure safe transportation for North Carolina's public school students. The Committee included representatives from the North Carolina Department of Public Instruction, the North Carolina Division of Motor Vehicles, the Federal Motor Carrier Safety Administration, Plaintiff North Carolina Motorcoach Association, and one parent representative. (See Pls.' Br. Opp. Def.'s Mot. Dismiss Ex. A. [Doc. # 9] ("School Charter Transportation Safety Committee Recommended Guidelines & Procedures") (hereinafter "Guidelines") at 2.)[2]

In June 2001, the Committee issued its "Recommended Guidelines and Procedures" ("Guidelines") to all public schools in North Carolina regarding the hiring and chartering of motorcoaches to transport public school students. The Guidelines consist of a three-step approach for contracting with private motor carriers. The first step is for school systems (e.g., Guilford County Schools)[3] to establish a list of

would be a misdemeanor. *See Bd. of Governors of Univ. of N.C. v. Helpingstine,* 714 F.Supp. 167, 175 (M.D.N.C. 1989) (holding that § 66–58 does not create a private right of action). Therefore, regardless of whether Defendant was or is violating section 115C–247, this Court lacks the authority to provide Plaintiffs any relief for such violation. Therefore, Plaintiffs' claim that Defendant is using activity buses in contravention of North Carolina law is hereby dismissed with prejudice.

**2.** Because the Guidelines are referred to in Plaintiffs' Complaint and are central to Plaintiffs' claims, even though they were not attached to Plaintiffs' Complaint, the Court may consider them when ruling on Defendant's Motion to Dismiss. *See, e.g., Venture Assocs. Corp. v. Zenith Data Sys.,* 987 F.2d 429, 431–

32 (7th Cir.1993) (holding that, on a motion to dismiss, a court is permitted to consider documents that are referred to in the plaintiffs' complaint and central to the plaintiffs' claims, even if not attached to the complaint); *Northeast Solite Corp. v. Unicon Concrete, LLC,* 102 F.Supp.2d 637, 639 (M.D.N.C. 1999) (same).

**3.** The Court notes that the Guidelines use the terms "schools," "school districts," and "school systems," but not "school boards." The Court will outline the differences between school boards, school administrative units, school systems, school districts, and schools in Section III.B.2 below. As discussed more fully in that section, although the Guidelines refer to schools, school districts, and school systems, ultimately it is Defendant Guilford

approved motor carriers. To determine if a carrier should be placed on the approved list, the Guidelines recommend that the school system conduct detailed background checks of the motor carriers, including the performance of safety inspections, financial inspections, reference checking, and review of the driver qualification files. The second step is for the school chartering the motorcoach to enter into a contract with the motor carrier. The Guidelines provide a list of items that should be included in the contract. The third step under the Guidelines is for a school representative (typically the principal or his designee) to conduct a pretrip review of certain information regarding the motorcoach and its operator.

After the Guidelines were issued, Defendant reviewed the Guidelines and established its own minimum standards for motor carriers who wished to be placed on Defendant's approved list of motor carriers. Defendant incorporated these minimum standards in a "Request for Information" form ("RFI"), which states that "[i]n order to be placed on our list of qualified providers, carriers must submit the required documentation/information ...." (Def.'s Mot. Dismiss & Strike Ex. A. [Doc. # 5] (hereinafter "RFI") at 1.)[4] According to Plaintiffs, Defendant's requirements as listed in the RFI substantially exceed the Guidelines, the Federal Motor Carrier Safety Regulations ("FMCSR"), and other applicable laws and regulations. Thus, Plaintiffs contend that the RFI is unlawful. In particular, Plaintiffs challenge the following requirements in the RFI: (1) $10,000,000 minimum liability insurance, which exceeds the minimum required by

County Board of Education that controls the Guilford County Schools. Thus, it is Defendant who has implemented the Guidelines through its Request for Information ("RFI"), and Defendant is ultimately the entity with whom the motor carriers enter into contracts.

the FMCSR; (2) inspections of the carriers' motorcoaches by Defendant; and (3) review by Defendant of confidential information of the motor carriers' operators. Carolina American also asserts individual harm because it had existing contracts to serve as a motor carrier for designated trips with several public schools in Guilford County. Those schools included Kiser Middle School, Jamestown Middle School, Sternberger Elementary School, Monticello–Brown Summit Elementary School, Stokesdale Elementary School, and Allen Jay Elementary School. Carolina American and other NCMA members refused to comply with the RFI, contending it imposed illegal burdens on motor carriers. Therefore, Carolina American alleges that because it failed to comply with the RFI, Defendant caused Carolina American's contracts with the schools in Guilford County to be cancelled.

On February 25, 2002, Carolina American and NCMA filed their Complaint in the General Court of Justice, Superior Court Division, of Guilford County, North Carolina, asserting claims under both federal and state law. Both Carolina American and NCMA assert federal claims that Defendant's implementation of the RFI violates both the Commerce Clause and the Supremacy Clause of the United States Constitution. Plaintiffs' state-law claims include claims for tortious interference with contract and tortious interference with prospective economic advantage. On March 26, 2002, Defendant removed the action to this Court on the basis of federal-question and supplemental jurisdiction. On April 29, 2002, Defendant filed its Mo-

4. Like the Guidelines, because the RFI is referred to in Plaintiffs' Complaint and central to Plaintiffs' claims, even though it was not attached to Plaintiffs' Complaint, the Court may consider it when ruling on Defendant's Motion to Dismiss. See supra note 2.

tion to Dismiss and to Strike pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(f). In its Motion pursuant to Rule 12(b)(1), Defendant contends that Plaintiff Carolina American lacks standing to bring its Commerce Clause claim, but Defendant concedes that Plaintiff Carolina American has standing to bring its Supremacy Clause claim and each of its state-law claims. Defendant further contends, however, that Plaintiff NCMA lacks standing to bring any of its claims. In its Motion pursuant to Rule 12(b)(6), Defendant contends that, even if the Court finds that Carolina American has standing to bring its Commerce Clause claim or that NCMA has standing to bring some or all of its claims, all of Plaintiffs' claims against Defendant fail as a matter of law. Finally, with respect to its Motion pursuant to Rule 12(f), Defendant asks this Court to strike Plaintiffs' claims for punitive damages. Because Defendant's Motion pursuant to Rule 12(b)(1) challenges this Court's subject matter jurisdiction over Plaintiffs' claims, the Court will first determine whether Carolina American has standing to pursue its Commerce Clause claim and whether NCMA has standing to pursue any of its claims.

## II. MOTION TO DISMISS PURSUANT TO RULE 12(b)(1)

### A. Standard of Review

■ Because Defendant challenges Plaintiffs' standing to even bring their claims in this Court, Defendant is challenging this Court's subject matter jurisdiction over Plaintiffs' claims. The Court notes that there are two ways in which to present a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982). The defendant may contend either that the complaint fails to allege facts upon which subject matter jurisdiction can be based, or that the jurisdictional facts alleged in the complaint are untrue. *Id.* Because, in the instant case, Defendant raises the former argument (i.e., the allegations in the Complaint fail, as a matter of law, to support subject matter jurisdiction), Plaintiffs enjoy procedural safeguards similar to those they would enjoy when opposing a Rule 12(b)(6) motion. *See id.* As such, the Court will accept Plaintiffs' allegations as true, construing them most favorably to Plaintiffs, and will rely solely on the pleadings, disregarding affidavits or other materials, to determine whether Plaintiffs' Complaint contains sufficient allegations to support subject matter jurisdiction. *See id.; Higgins v. United States,* 894 F.Supp. 232, 234 (M.D.N.C. 1995), *aff'd per curiam,* No. 95–2741, 1996 WL 160782 (4th Cir. Apr.8, 1996). In the present case, therefore, Defendant will prevail on the issue of standing only if the allegations in Plaintiffs' Complaint are insufficient as a matter of law to support subject matter jurisdiction. *See Adams,* 697 F.2d at 1219.

### B. Standing Requirements

■ As stated above, Defendant argues that Plaintiffs' Complaint demonstrates on its face that the Court lacks subject matter jurisdiction in this case. The specific basis for this argument is that Plaintiffs have no standing to sue Defendant. The question of standing ultimately asks whether litigants are "entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Only if plaintiffs have standing to sue do they present a case or controversy between themselves and the defendant within the meaning of Article III of the Constitution. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210

(1998). Standing, therefore, is a fundamental component of a court's subject matter jurisdiction. *Id.; Pye v. United States,* 269 F.3d 459, 466 (4th Cir.2001). Resolution of the question of standing necessarily takes precedence over the question of whether plaintiffs have stated a claim upon which relief can be granted, that is, without jurisdiction, the court has no power to rule on the validity of a claim. *Steel Co.,* 523 U.S. at 94–95, 118 S.Ct. at 1012–13; *see also Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) ("For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction ...."); *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1869) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."). In the instant matter, Defendant maintains that Plaintiffs lack standing; consequently, Defendant asserts that the Court lacks subject matter jurisdiction.

The Court first notes that to satisfy the "irreducible constitutional minimum of standing," *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), that is, to assert a case or controversy under Article III of the Constitution, Plaintiffs must establish three elements: (1) injury in fact, (2) traceability, and (3) redressability. *See id.* at 560–61, 112 S.Ct. at 2136; *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 154 (4th Cir. 2000) (en banc). Plaintiffs satisfy the injury-in-fact requirement if they have suffered an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent. *See Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136; *Friends of the Earth,* 204 F.3d at 154. Traceability refers to causation. Plaintiffs must demonstrate that the injury they have suffered was caused by the challenged conduct of Defendant, and not by the independent action of some third party. *See Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136; *Friends of the Earth,* 204 F.3d at 154. Finally, redressability assures the effectiveness of judicial involvement. Plaintiffs must show that it is likely, and not merely speculative, that a favorable decision will remedy the injury. *See Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136; *Friends of the Earth,* 204 F.3d at 154. Although each of the three elements "should be examined distinctly, their proof often overlaps." *Friends of the Earth,* 204 F.3d at 154. Moreover, all three share the common purpose of ensuring that the judiciary, and not another branch of government, is the appropriate forum in which to address the complaint. *Id.* (citing *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984)). In addition to these "core" constitutional requirements for standing, the Supreme Court has also developed additional "prudential"[5] requirements that must be met in order for plaintiffs to have standing to pursue their claims, as well as special rules that govern when an organization may sue in a representative capacity on behalf of its members. The Court will

---

**5.** As the Supreme Court has recently held, prudential standing requirements are "judicially self-imposed limits on the exercise of federal jurisdiction [that] are founded in concern about the proper—and properly limited—role of the courts in a democratic society ...." *Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997) (internal quotations omitted) (citations omitted).

discuss the application of each of these standing requirements as necessary to determine whether Carolina American and NCMA have standing to pursue their claims in this Court.

Having addressed the standard of review for Defendant's 12(b)(1) Motion and the constitutional requirements for standing, the Court will now discuss whether Plaintiffs' Complaint contains sufficient allegations to demonstrate that either Carolina American or NCMA has standing to bring its respective claims. The Court will first discuss whether Carolina American has standing to bring its Commerce Clause claim against Defendant. The Court will then discuss whether NCMA has standing to bring any of its claims against Defendant.

### C. Whether Carolina American Has Standing to Bring Its Commerce Clause Claim Against Defendant

#### 1. Article III Standing

■ With respect to Plaintiff Carolina American, Defendant first contends that Carolina American lacks Article III standing to bring its Commerce Clause claim against Defendant, that is, that Plaintiff Carolina American has failed to allege an injury in fact fairly traceable to Defendant's conduct that can be redressed by this Court. *See Lujan,* 504 U.S. at 560–61, 112 S.Ct. at 2136; *Friends of the Earth,* 204 F.3d at 154. Defendant focuses in particular on the first prong of the standing inquiry—injury in fact. Defendant contends that, because Plaintiff Carolina American's Commerce Clause claim is based solely on the RFI's discriminatory effect on out-of-state motor carriers, until Carolina American completes the RFI, the Board's requirements will not negatively impact Carolina American's ability to hire out-of-state carriers. Therefore, according to Defendant, because Carolina American is not presently impacted by Defendant's purported restrictions, it has not alleged a concrete, particularized, and imminent injury and thus does not have standing. The Court, however, believes that Carolina American's Commerce Clause claim can be fairly construed as being broader than Defendant suggests. Viewing the allegations of the Complaint in the light most favorable to Carolina American, Carolina American seems to have alleged an injury in fact by asserting that the RFI violates the Commerce Clause under two separate but somewhat interrelated theories: (1) the RFI discriminates against out-of-state carriers and, therefore, is unconstitutional (Compl.¶¶ 55–56) [6]; and (2) the RFI, even if it does not discriminate against out-of-state carriers, "has prevented Carolina American and other NCMA members from engaging in interstate commerce with their longstanding customers among the public schools in Guilford County . . . ." (*Id.* ¶ 56.) [7]

Defendant's argument that Carolina American has failed to allege an injury in

6. *See Wyoming v. Oklahoma,* 502 U.S. 437, 454, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992) (holding that "the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors" (internal quotations omitted)).

7. *See Dennis v. Higgins,* 498 U.S. 439, 448, 111 S.Ct. 865, 871, 112 L.Ed.2d 969 (1991) (holding that "[t]he [Supreme] Court has often described the Commerce Clause as conferring a 'right' to engage in interstate trade free from restrictive state regulation"); *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 447, 98 S.Ct. 787, 797, 54 L.Ed.2d 664 (1978) (invalidating state regulations on the length of trucks because the regulations "place[d] a substantial burden on interstate commerce and . . . [did not] make more than the most speculative contribution to highway safety").

fact seems to be that until Carolina American complies with the RFI, which Carolina American contends is illegal, it may not challenge the RFI in this Court. With respect to Carolina American's first theory of recovery under the Commerce Clause (i.e., the RFI discriminates against out-of-state motor carriers), the Court finds that even if Carolina American were to complete the RFI, it might still be unduly burdened by the RFI's effect on out-of-state motor carriers that it would be unable to contract with. Thus, if this Court were to either invalidate the RFI's allegedly onerous requirements on Carolina American or if Carolina American instead opted to comply with the RFI, Carolina American contends that it would still be financially burdened by the RFI to the extent that it would not be able to contract with out-of-state carriers who did not meet the RFI's requirements. Thus, under Carolina American's first theory of recovery, completion of the RFI would not be a prerequisite to filing a lawsuit in this Court.

Furthermore, with respect to Carolina American's second theory of recovery (i.e., the RFI imposes an undue burden on Carolina American's ability to engage in interstate commerce), the Court finds that Carolina American need not comply with the RFI in order to have standing to challenge the RFI in this Court. The Court notes that the Rhode Island District Court's decision in *Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence,* 108 F.Supp.2d 73 (D.R.I.2000), is analogous to the present case. In *Associated Builders & Contractors,* the plaintiffs were contractors who sought to bid on construction projects in Providence, Rhode Island. The plaintiffs did not have any contractual relationships with any labor unions and did not wish to. However, the Providence City Council had enacted a tax treaty that stabilized property taxes for Union Station Plaza Associates, L.P. ("Union Station") (an intervenor in the action) if Union Station agreed to abide by a Project Labor Agreement ("PLA"). In effect, the PLA required Union Station to only use contractors and subcontractors who abided by the PLA, which would have forced the plaintiffs to unionize. The plaintiffs sued, alleging that the tax treaty (because of the PLA requirement) had deterred it from bidding on the hotel that Union Station was building (the "Union Station Project"), that the City of Providence sought to establish similar tax treaties, that such tax treaties violated the Supremacy Clause[8] of the United States Constitution because they were preempted by the NLRA, and that such tax treaties would deter them from bidding on future projects.

The defendants moved to dismiss the plaintiffs for lack of standing. The defendants' contended that because the plaintiff contractors had not bid on either the Union Station Project or any other pending projects, they had not suffered an injury in fact and therefore lacked Article III standing. The district court disagreed. It first held that "[w]hen contractors and employees are deterred from bidding or working on projects because of state or local encroachment of their federal rights, they sustain an injury." *Id.* at 77 (citing *Asso-*

---

**8.** The Court believes that the rationale of *Associated Builders* would apply to the present case, even though in this case Defendant challenges Carolina American's standing to bring its Commerce Clause claim, not its Supremacy Clause claim. *Cf. Associated Builders,* 108 F.Supp.2d at 77 (holding that "[w]hen con-

tractors and employees are deterred from bidding or working on projects because of state or local encroachment of their federal rights, they sustain an injury" and rejecting the argument that such a rule would vary whether the injury was suffered in violation of the Equal Protection Clause or the Supremacy Clause).

*ciated Gen. Contractors of Am. v. Metro. Water Dist.,* 159 F.3d 1178, 1181 (9th Cir. 1998) (citing *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993))). Thus, because the plaintiffs had alleged "that they were and are willing to bid or work on the Union Station Project and other projects and that they are deterred from doing so as a result of the City's policy," the plaintiffs had sufficiently identified a concrete and particularized injury in fact. *Id.* at 78. Further, based on the plaintiffs' evidence of their past construction work in Providence and their desire to perform additional work, the district court found that the plaintiffs' injury satisfied the Supreme Court's requirement that the injury be "actual or imminent." *Id.* at 78–79.

In this case, Carolina American alleges that Defendant's procedures have not only deterred it from entering into contracts to transport Guilford County public school students but have actually prevented it from doing so. In fact, Carolina American has alleged that not only had it bid on motor-carrier contracts prior to the implementation of the RFI, but Defendant, because of the RFI, actually cancelled several of Carolina American's contracts. Based on these allegations, the Court finds that Carolina American's Complaint contains sufficient allegations of an injury in fact. Furthermore, the Court finds that Carolina American has also sufficiently alleged that its injuries are fairly traceable to Defendant's conduct and are redressable by this Court. Thus, the Court finds that, at this stage of the proceedings, Carolina American's Complaint has adequately alleged Article III standing to withstand Defendant's present Rule 12(b)(1) Motion with respect to Carolina American's Commerce Clause claim.

### 2. Prudential Limitations on Standing

■ Finding that Carolina American has Article III standing to pursue its Commerce Clause claim, however, does not end the inquiry. The Court must now determine whether there are prudential limitations that would prevent Carolina American from having standing to bring its Commerce Clause claim. As the Supreme Court has repeatedly held, "prudential limitations add to the constitutional minima a healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed, the claim not be an abstract, generalized grievance that the courts are neither well equipped nor well advised to adjudicate." *Sec'y of State v. Joseph H. Munson Co.,* 467 U.S. 947, 955 n. 5, 104 S.Ct. 2839, 2846 n. 5, 81 L.Ed.2d 786 (1984). The prudential limitation relevant to this case is the doctrine of third-party standing. As the Supreme Court held in *Warth v. Seldin,* a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Defendant contends that under *Warth* and its progeny, therefore, even if Carolina American had completed the RFI, the prudential limitation against third-party standing prevents Carolina American from bringing its Commerce Clause claim. The crux of Defendant's argument is that because Carolina American's Commerce Clause claim is premised on the notion that the RFI illegally discriminates against out-of-state carriers, out-of-state carriers are the proper parties to bring the Commerce Clause claim, not Carolina American. In its Brief in Opposition to Defendant's Motion to Dismiss [Document # 9], Carolina American does not appear to even address this argument. At the

Motion Hearing, however, Carolina American contended that it does in fact have standing to pursue its Commerce Clause claim because "out-of-state carrier discrimination is ... an element of damage and harm to the in-state carriers because the out-of-state carriers are being discriminated against and we use them from time to time." (Mot. Hr'g Tr.)

In contending that Carolina American cannot bring a claim on behalf of third parties (i.e., out-of-state motor carriers), Defendant relies on *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372 (8th Cir.1997). *Ben Oehrleins* is a case in which the Eighth Circuit Court of Appeals held that, under *Warth v. Seldin*, the plaintiffs could not bring their Commerce Clause claims on behalf of third parties when the only injuries the plaintiffs had sustained were the increased costs of purchasing services from those third parties. In *Ben Oehrleins*, the defendant, Hennepin County, enacted a regulation governing the disposal of solid waste. This regulation increased the costs to the waste processors and waste haulers, and ultimately these costs were passed on to the waste haulers' customers. The waste haulers, waste processors, and the waste haulers' customers then challenged the regulation under the Commerce Clause, and the defendant sought to have the customers dismissed for lack of standing. The Eighth Circuit Court of Appeals found that the customers had Article III standing but had failed to satisfy the prudential limitations on standing, that is, the custom-

ers' claims were barred by the third-party standing doctrine as articulated in *Warth v. Seldin*. Thus, the court found that it lacked subject matter jurisdiction over the customers' claims.

The critical problem with Defendant's argument, however, is that in this case Carolina American.) is asserting not only the rights of out-of-state motor carriers, but is actually asserting its own right to be free from restrictions that excessively burden its ability to engage in interstate commerce. Although in *Ben Oehrleins* the court held that "the [customers] cannot claim any personal right under the Commerce Clause to lower garbage bills," *Ben Oehrleins*, 115 F.3d at 1381, Carolina American can at least assert a claim that it has a right to be free of undue restrictions on its ability to engage in interstate commerce. Thus, while this Court agrees with the *Ben Oehrleins* court's statement that "[w]e are aware of no Commerce Clause case in which the [Supreme Court] has granted standing to a plaintiff who was a consumer whose alleged harm was the passed-on cost incurred by the directly regulated party," *id.* at 1380, in this case Carolina American has alleged that it is more than a mere consumer. Carolina American's Complaint contains allegations that it is a "directly regulated party" under the RFI. Therefore, the Court finds that Carolina American does have standing to bring its Commerce Clause claim to the extent that it alleges that Defendant has unduly burdened Carolina American's own ability to engage in interstate commerce.[9]

---

**9.** In *Ben Oehrleins*, the court also held that the waste haulers' customers did not come within the zone of interests protected by the Commerce Clause and therefore also lacked standing on that basis. *Ben Oehrleins*, 115 F.3d at 1381–82. Defendant contends, therefore, that Carolina American also does not come within the "zone of interests" protected by the Commerce Clause and thus contends

that this Court may not exercise jurisdiction on that basis. (Def.'s Br. Supp. Mot. Dismiss & Strike at 14 n. 6 (citing *Ben Oehrleins*, 115 F.3d at 1381–82).) As a threshold matter, it is unclear under Fourth Circuit case law whether the zone-of-interests test even applies in cases that do not involve the Administrative Procedures Act. *See, e.g., Taubman Realty Group Ltd. P'ship v. Mineta*, 320 F.3d 475,

To the extent that Carolina American seeks to bring a Commerce Clause claim based on Defendant's alleged discrimination against out-of-state motor carriers, however, Carolina American does in fact lack standing to assert such a claim.[10]

### D. Whether North Carolina Motorcoach Association Has Standing

■ The Court will now address Defendant's contentions that Plaintiff North Carolina Motorcoach Association lacks standing to pursue any of its claims in this Court. An association may allege standing under two distinct theories. *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1250 (4th Cir.1991). First, it " 'may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.' " *Id.* (quoting *Warth v. Seldin*, 422 U.S. at 511, 95 S.Ct. at 2211). "Second, the association may have standing as the representative of its members who have been harmed." *Id.* (citing *Warth* ); *see also Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S.

333, 341–45, 97 S.Ct. 2434, 2440–43, 53 L.Ed.2d 383 (1977).

■ In the present case, NCMA does not contend that it has standing in its own right. Instead, NCMA contends that it has representational standing on behalf of its motor-carrier members. In *Hunt*, the Supreme Court held that "[a]n organization has representational standing when (1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Md. Highway Contractors*, 933 F.2d at 1251 (citing *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441). In *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996), the Supreme Court clarified that *Hunt*'s first and second prongs are constitutional requirements, but that *Hunt*'s third prong is a prudential requirement. *Id.* at 554–58, 116 S.Ct. at 1535–37.

480 (4th Cir.2003) (citing *Pye v. United States*, 269 F.3d 459, 466–67 (2001)) (holding that "a plaintiff challenging agency action under the APA must satisfy an additional standing requirement, [the zone-of-interests test,] which is a prudential rather than a constitutional standing requirement"); *see also id.* at 481 n. 3 (holding that the plaintiff did not have to meet the zone-of-interests test to bring its Supremacy Clause claim). As discussed above, the Court has found that *Ben Oehrleins* is distinguishable with respect to the issue of third-party standing. Therefore, regardless of the applicability of the zone-of-interests test, for substantially the same reasons the Court found that the limitations on third-party standing do not bar Carolina American from bringing its Commerce Clause claim, the Court also finds *Ben Oehrleins* to be distinguishable with respect to the zone-of-interests test. Therefore, Carolina American, as a motor carrier engaging in interstate commerce that is directly impacted by the RFI, would

come within the zone of interests protected by the Commerce Clause. *See Oxford Assocs. v. Waste Sys. Auth.*, 271 F.3d 140, 148 (3d Cir. 2001) (distinguishing *Ben Oehrleins* and finding that the plaintiffs satisfied the zone-of-interests test); *Huish Detergents. Inc. v. Warren County, Ky.*, 214 F.3d 707, 711 (6th Cir. 2000) (distinguishing *Ben Oehrleins* and finding that the plaintiff satisfied the zone-of-interests test).

10. The Court notes that its finding that Carolina American lacks standing to assert a Commerce Clause claim based solely on discrimination against out-of-state motor carriers ultimately will not affect the Court's disposition of Carolina American's Commerce Clause claim on the merits; rather, this finding merely limits the extent to which Carolina American may contend that it has suffered an injury due to Defendant's alleged violations of the Commerce Clause.

As an initial matter, although not asserted by Defendant, to the extent that NCMA brings its Commerce Clause claim based on Defendant's discrimination against out-of-state motor carriers, the Court finds that the first prong of the *Hunt* test prevents NCMA from bringing such a claim. As discussed above with respect to Carolina American, motor carriers based in North Carolina would not have standing to bring Commerce Clause claims based solely on discrimination against out-of-state motor carriers. Because NCMA's motor-carrier members are all based in North Carolina, none of NCMA's members could assert claims based solely on discrimination against out-of-state motor carriers. Therefore, under the first prong of the *Hunt* test, NCMA would lack Article III standing to assert such a claim in a representative capacity on behalf of its members.[11] Plaintiff NCMA therefore only has Article III standing to assert a Commerce Clause claim based on the alleged undue burden imposed on NCMA's in-state motor-carrier members.[12]

Having discussed NCMA's Article III standing to pursue its Commerce Clause claim, the Court will now address Defendant's arguments that NCMA fails to meet the third prong of the *Hunt* test and therefore cannot assert any of its claims.

First, Defendant contends that because some of NCMA's members have complied with the RFI and other members (e.g., Carolina American) have not, conflicts of interest exist that prevent NCMA from having standing. Second, Defendant contends that even if there are no conflicts of interest, NCMA may not sue for damages on behalf of its members. The Court will address each of Defendant's contentions in turn.

1. Whether Conflicts of Interest Require the Participation of Individual NCMA Members in This Lawsuit

In *Maryland Highways Contractors*, the Fourth Circuit Court of Appeals found that the association did not meet the third prong of the *Hunt* test because there were conflicts of interest among the members of the association that required the members to join the lawsuit individually to protect their own interests. *Md. Highways Contractors*, 933 F.2d at 1252–53. The court of appeals, at the summary judgment stage, found that there were conflicts of interests because some of the association's members would benefit from having the statute in question declared unconstitutional, while other members would benefit from having the statute upheld. *Id.* at 1253. The court further noted that the association's Board made the

---

**11.** Defendant's failure to assert an Article III challenge to NCMA's standing is likely due to confusion generated by Plaintiffs' Complaint and Plaintiffs' Brief in Opposition to Defendant's Motion to Dismiss. At the Motion Hearing, Plaintiffs' attorney asserted that, contrary to the plain language of Plaintiffs' Brief, that NCMA actually does not have any out-of-state motor-carrier members. (*See* Mot. Hr'g Tr. (stating that "[t]he out-of-state carriers are not members"). *But see* Pls.' Br. Opp. Def.'s Mot. Dismiss at 3 (stating that the RFI "prevent[s] Carolina American and other members of plaintiff association, including both in-state and out-of-state members, from 'doing business with their longstanding cus-

tomers among the public schools of Guilford County' ") (quoting Compl. ¶ 25).) However, because the Court may address subject matter jurisdiction sua sponte, Defendant's failure to raise this argument does not lessen this Court's ability to determine that subject matter jurisdiction does not exist for this reason.

**12.** As mentioned above with respect to Carolina American, the Court's limitation of NCMA's standing to bring its Commerce Clause claim will not affect the Court's disposition of this claim on the merits. *See supra* note 10 and accompanying text.

decision to litigate without consulting with its members, and the court believed that the association's "secrecy raise[d] suspicion regarding [its] motives ...." *Id.* Based on this evidence, the court of appeals held that the association lacked standing to represent its members.

In the present case, Defendant contends that because NCMA represents motor carriers who have not complied with the RFI (e.g., Carolina American) and motor carriers who have complied with the RFI and currently have contracts with Defendant, NCMA has a conflict of interest and therefore lacks standing to bring its claims in this Court. NCMA responds, however, that Defendant's assertions of conflicts of interest are purely speculative and, at the motion to dismiss stage, NCMA's Complaint contains sufficient allegations that NCMA represents the interests of its members to establish that it has standing to bring its claims. The Court notes that other courts that have applied *Maryland Highways Contractors* at the motion-to-dismiss stage have not read that case so strictly as Defendant suggests. *See Associated Util. Contractors of Md., Inc. v. Mayor and City Council*, 218 F.Supp.2d 749, 755 (D.Md.2002) (denying a motion to dismiss for lack of representational standing but noting that the court had serious doubts that, after discovery, the association would be able to meet the third prong of the *Hunt* test); *Mainstream Loudoun v. Bd. of Trustees of the Loudoun County Library*, 2 F.Supp.2d 783, 791–92 (E.D.Va. 1998) (holding that the organization's "diverse membership does not, by itself, demonstrate the existence of an actual conflict of interest in this case").

Furthermore, this Court notes that, at this stage, NCMA's Complaint is sufficient to show standing unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with

the allegations." *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (internal quotations omitted). NCMA's attorney argued at the Motion Hearing that NCMA may very well be able to prove, consistent with the allegations in its Complaint, "that in fact the harm is equal" to its members who have complied with the RFI and to those who have not complied. (Mot. Hr'g Tr.) Thus, it is NCMA's contention that even its members who have complied with the RFI would still prefer that the RFI be declared unconstitutional because it is unduly burdensome to them. While NCMA's contention to this effect may be speculative, at this stage of the proceedings the Court cannot hold, as a matter of law, that NCMA has conflicts of interests sufficient to warrant its dismissal from this case for lack of standing. As the district court held in *NAACP v. City of Annapolis*, 133 F.Supp.2d 795 (D.Md.2001), under *Maryland Highways Contractors*, all NCMA "must show [is] that it can adequately represent its membership." *City of Annapolis*, 133 F.Supp.2d at 803. The Court finds that the allegations in NCMA's Complaint, read in the light most favorable to NCMA, indicate that NCMA may be able to demonstrate facts consistent with these allegations that show that it can adequately represent both its members who are and who are not complying with the RFI.

2. Whether NCMA Lacks Standing Because It Seeks Monetary Damages on Behalf of Its Members

Having determined that, at this stage of the proceedings, NCMA is not precluded from representing its members due to conflicts of interests between members who are and are not complying with the RFI, the Court must now address Defendant's second argument that NCMA lacks standing, that is, that NCMA lacks standing to seek damages for its individual

members. In *Warth v. Seldin,* the Supreme Court held that the association did not have standing to bring claims for damages on behalf of its members because "to obtain relief in damages, each member of [the association] who claims injury as a result of [the defendants'] practices must be a party to the suit ...." *Warth v. Seldin,* 422 U.S. at 516, 95 S.Ct. at 2214. The Supreme Court noted that "in the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree." *Id.* In *Hunt v. Washington State Apple Advertising Commission,* the Supreme Court, relying on *Warth,* "indicated that [individual] participation would be required in an action for damages to an association's members, thus suggesting that an association's action for damages running solely to its members would be barred for want of the association's standing to sue." *United Food & Commercial Workers,* 517 U.S. at 546, 116 S.Ct. at 1531 (citing *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441). However, as the Supreme Court held in *United Food & Commercial Workers,* the bar on associations bringing damages claims on behalf of their members is prudential, not constitutional. But just because the bar on associations bringing damages claims on behalf of their members is prudential does "not, of course, ... rob it of its value." *United Food & Commercial Workers,* 517 U.S. at 556, 116 S.Ct. at 1536. As the Third Circuit Court of Appeals has held, "[b]ecause claims for monetary relief usually require individual participation, courts have held associations cannot generally raise these claims on behalf of their members." *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.,* 280 F.3d 278, 284 (3d Cir.2002).

The Court finds no reason to relax this prudential requirement in this case. In fact, NCMA even seems to concede that it cannot bring claims for damages on behalf

of its members. Accordingly, to the extent that NCMA seeks damages under its Supremacy Clause and Commerce Clause claims, NCMA lacks standing to bring these claims. However, NCMA is not precluded on the basis of standing from seeking any injunctive relief for its members with respect to its Commerce Clause and Supremacy Clause claims. In addition, because NCMA's claims for tortious interference with contract and tortious interference with prospective economic advantage are solely claims for monetary damages, NCMA also lacks standing to bring these claims.

E. Conclusion on the Issues of Standing for Carolina American and NCMA

In summary, therefore, the Court finds that Plaintiff Carolina American has standing to pursue all of its claims, including its Commerce Clause claim, against Defendant. In addition, NCMA has standing to pursue its claims for injunctive and/or declaratory relief, that is, NCMA has standing to seek injunctive or declaratory relief under the Supremacy Clause and the Commerce Clause. Having disposed of the issues of standing, the Court will now address Defendant's Rule 12(b)(6) Motion to Dismiss Plaintiffs' claims on the merits.

III. MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Defendant contends that even if Plaintiffs have standing to bring their claims against Defendant, each of those claims fails as a matter of law. The Court, therefore, will address each of Plaintiffs' claims to determine whether they survive Defendant's Motion to Dismiss pursuant to Rule 12(b)(6).

A. Standard of Review

With respect to a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a

claim upon which relief can be granted, dismissals are allowed "only in very limited circumstances." *Rogers v. Jefferson–Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir.1989). Generally, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (alteration in original) (internal quotations omitted); *accord Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). In making this determination, a court must view the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded allegations. *Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994). Thus, the purpose of a motion to dismiss is to test the legal sufficiency of the complaint and not the facts that support it. *Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Revene v. Charles County Comm'rs,* 882 F.2d 870, 872 (4th Cir.1989) (internal quotations omitted).

### B. Federal Claims: Supremacy Clause and Commerce Clause

Plaintiffs contend that the RFI violates both the Supremacy Clause and the Commerce Clause of the United States Constitution. In short, Plaintiffs contend that Defendant's RFI violates the Supremacy Clause because it conflicts with the provisions of the Federal Motor Carrier Safety Act ("FMCSA") and the regulations promulgated under that Act, the Federal Motor Carrier Safety Regulations ("FMCSR"). Plaintiffs further contend

that the RFI violates the Commerce Clause because it imposes an unjustified, excessive burden on interstate commerce. Defendant contends, however, that both of Plaintiffs' claims fail under what is known as the "market participant" exception, that is, because Defendant is acting as a market participant by contracting with motor carriers, as opposed to acting as a regulator by regulating the conduct of motor carriers, its actions do not violate either the Supremacy Clause or the Commerce Clause. Defendant further contends that even if the market participant exception does not apply to Plaintiffs' Supremacy Clause claim, the Federal Motor Carrier Safety Act and its accompanying regulations do not preempt Defendant's RFI. The Court will first consider Plaintiffs' argument that the RFI is invalid under the Supremacy Clause because it is preempted by the FMCSA and the FMCSR. The Court will then consider Plaintiffs' argument that the RFI violates the Commerce Clause.

#### 1. Supremacy Clause

■ The Supremacy Clause of the United States Constitution states that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, the question before the Court is whether federal law preempts Defendant's RFI, thus making that RFI invalid. Plaintiffs contend that the FMCSA and the FMCSR preempt Defendant's RFI and therefore Defendant's RFI is unconstitutional.[13] Defendant contends,

---

**13.** As a technical matter, the Court notes that Plaintiffs and Defendant discuss cases that

interpreted earlier versions of the FMCSA and FMCSR. The differences between the earlier

however, that the RFI is not a regulation and therefore is not covered by the Supremacy Clause.[14] Regardless, even if the RFI were a regulation, Defendant contends that the FMCSA, as applied by the FMCSR, would not preempt the RFI. As the Supreme Court has held, there are two major types of preemption: express preemption and implied preemption. Express preemption occurs when "Congress' command is explicitly stated in the statute's language ...." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 98, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992) (internal quotations omitted). Implied preemption occurs when preemption is "implicitly contained in [the statute's] structure and purpose." *Id.* (internal quotations omitted). In the absence of explicit statutory language preempting state law, the Supreme Court has recognized two types of implied preemption: field preemption and conflict preemption. *Id.* Field preemption occurs when "the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it ...." *Id.* (internal quotations omitted). Conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotations omitted).

Plaintiffs first contend that the FMCSA explicitly preempts the RFI. In making this argument, Plaintiffs rely on the provisions of 49 U.S.C. § 31141. The Court notes that 49 U.S.C. § 31141 provides a review procedure that preempts "a State law or regulation on commercial motor vehicle safety that the *Secretary of Transportation* decides under [§ 31141] may not be enforced." § 31141(a) (emphasis added). Under § 31141, "if the Secretary decides a State law or regulation is additional to or more stringent than [the FMCSR], the State law or regulation may be enforced unless the Secretary also decides that ... the State law or regulation has no safety benefit," *id.* § 31141(c)(4), (c)(4)(A), "the State law or regulation is incompatible with the regulation prescribed by the Secretary," *id.* § 31141(c)(4)(B), or "enforcement of the State law or regulation would cause an unreasonable burden on interstate commerce." *Id.* § 31141(c)(4)(C). Section 31141(b) requires "[a] State ... that enacts a State law or issues a regulation on commercial motor vehicle safety [to] submit a copy of the law or regulation to the Secretary immediately after the enactment or issuance." In the present case, Plaintiffs contend that the RFI is more stringent than the FMCSR. *See id.* § 31141(c)(4). Plaintiffs further contend that the RFI has no safety benefit, is incompatible with the FMCSR, and causes an unreasonable burden on interstate commerce. *See id.* Therefore, according to Plaintiffs, the FMCSR expressly preempts the RFI.

versions of the FMCSA and FMCSR and the current versions do not affect the outcome of this lawsuit. Therefore, for ease of reference, the Court will always cite to the current versions of the FMCSA and FMCSR.

14. Although the Court will address this argument, which is essentially Defendant's "market participant exception" argument, in the context of deciding Plaintiffs' Commerce Clause Claims (*infra* Section III.B.2), because it does not affect the Court's disposition of Plaintiffs' Supremacy Clause claims, the Court declines to address the market participant exception argument with respect to Plaintiffs' Supremacy Clause claims. Therefore, the Court will assume, without deciding, that the RFI is a regulation that could come within the purview of the Supremacy Clause.

The flaw with Plaintiffs' argument is that § 31141 provides express preemption only where the Secretary of Transportation determines that a state regulation is preempted. An examination of the purpose of § 31141 reveals that, absent action by the Secretary of Transportation, the FMCSR will not expressly preempt state law. The beginning point of such a discussion is 49 U.S.C. § 14501. Section 14501(a)(1) prohibits states and their political subdivisions from enacting laws relating to the "scheduling of interstate or intrastate transportation ... provided by a motor carrier of passengers," "the implementation of any change in the rates for such transportation or for any charter transportation," or "the authority to provide intrastate or interstate charter bus transportation." Section 14501(a)(2), however, states that the provisions of § 14501(a)(1) "shall not restrict the safety regulatory authority of a State with respect to motor vehicles ... or the authority of a State to regulate carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization." Section 14501(c) regulates "motor carriers of property," and it contains a safety exception similar to § 14501(a)(2). *See* § 14501(c)(2)(A). In discussing the construction of the safety exception codified in § 14501(c)(2)(A), the Supreme Court noted that § 31141 "affords the *Secretary of Transportation* a means to prevent [that] safety exception from overwhelming the lawmakers' deregulatory purpose." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 441, 122 S.Ct. 2226, 2237, 153 L.Ed.2d 430 (2002) (emphasis added). The Supreme Court held that § 31141 "authorizes the Secretary to void any 'State law or regulation on commercial motor vehicle safety' that, in the Secretary's judgment, 'has no safety benefit ... [or] would cause an un-

reasonable burden on interstate commerce.'" *Id.* (alteration in original) (quoting § 31141(a), (c)(4)). Because of the similarity between § 14501(a)(2) and § 14501(c)(2)(A), the Supreme Court's analysis of the effect of § 31141 would apply with equal force to its effect on safety regulations for motor carriers transporting passengers. Thus, based on the statutory language, as interpreted by the Supreme Court, it is the Secretary of Transportation, not this Court, that determines whether § 31141 expressly preempts state laws or regulations regulating motor-carrier safety.

Plaintiffs contend, however, that because Defendant "violated § 31141(b) by failing to submit the procedures to the Secretary of Transportation," Defendant "cannot now argue that plaintiffs' preemption claim is barred because the Secretary of Transportation did not determine that the procedures were preempted." (Pls.' Br. Opp. Def.'s Mot. Dismiss at 16 n. 11.) To the extent that Plaintiffs argue that § 31141 does not prevent this Court from determining whether the RFI is preempted by federal law, this Court agrees with Plaintiffs' argument. *See Interstate Towing Ass'n v. City of Cincinnati, Ohio*, 6 F.3d 1154, 1161 (6th Cir.1993) (citing § 31141(f)) (holding that the provisions of § 31141 "do not diminish the judiciary's power to determine that the [FMCSA] or related federal regulations preempt particular state motor carrier laws"). Defendant's failure to submit the RFI to the Secretary of Transportation, however, does not mean that the RFI is automatically preempted by § 31141. *See Interstate Towing*, 6 F.3d at 1160 (holding that a state's failure to submit its laws for review "certainly does not support [the] argument that the review provisions [of § 31141] act to preempt state and local law even in the absence of affirmative steps by the Secretary"). In

summary, therefore, Plaintiffs cite no authority for their contention that the FMCSA or the FMCSR expressly preempts the RFI or that § 31141 allows this Court to find express preemption based on its provisions. Therefore, Plaintiffs' express-preemption claim fails as a matter of law.

Plaintiffs further contend, however, that there is implied preemption. Although it is unclear from their brief, Plaintiffs first appear to contend that field preemption is present, that is, in enacting the FMCSA, Congress intended to occupy the field of motor-carrier safety and therefore Defendant's RFI is per se preempted. To the extent that Plaintiffs allege that "Congress intended to completely occupy the field of motor carrier safety," (Compl.¶ 49), Plaintiff's argument has been squarely rejected by the Fourth Circuit Court of Appeals. *See Specialized Carriers & Rigging Ass'n v. Virginia,* 795 F.2d 1152, 1155 (4th Cir. 1986) (holding that "Congress made clear in various sections of the [Federal] Motor [Carrier] Safety Act that no such comprehensive preemption was contemplated or intended"). In fact, Plaintiffs cite no authority supporting field preemption. In conclusion, therefore, the Court holds, consistent with *Specialized Carriers,* that Congress, when enacting the FMCSA, did not intend "to preempt the entire field of interstate highway safety ...." *Id.* at 1156.

Plaintiffs further contend, however, that "conflict preemption" is present in this case because the RFI is "inconsistent with and contradict[s] the FMCSR." (Compl.¶ 23.) In making this argument, Plaintiffs rely on *Specialized Carriers'* statement "that federal preemption under the [Federal Motor Carrier Safety] Act is only to be invoked where the State requirement is incompatible with the federal requirement or the state requirement de-

creases safety on the highways." *Specialized Carriers,* 795 F.2d at 1158 (internal quotations omitted). Plaintiffs' reliance on *Specialized Carriers* is misplaced. The Court first notes that *Specialized Carriers* relied on 49 C.F.R. § 390.9 (part of the FMCSR), which states, in pertinent part, that "[e]xcept as otherwise specifically indicated, Subchapter B of this chapter is not intended to preclude States or subdivisions thereof from establishing or enforcing State or local laws relating to safety, the compliance with which would not prevent full compliance with these regulations by the person subject thereto." 49 C.F.R. § 390.9. With respect to Plaintiffs' contention that the RFI is "inconsistent with and contradict[s]" the FMCSR, Plaintiffs point to no provisions of the RFI that "would ... prevent full compliance with" the FMCSA or FMCSR. *See id.*

Plaintiffs further contend, however, that because the RFI actually "detract[s] from highway safety," it is preempted. (Pls.' Br. Opp. Def.'s Mot. Dismiss at 18.) In advancing this argument, Plaintiffs direct the Court to their allegation that the RFI "require[s] representatives from the defendant Board's transportation department to inspect a carrier's motorcoaches" and their further allegation that "[u]pon information and belief, representatives from defendant Board's transportation department are not qualified to inspect motorcoaches." (Compl.¶ 21.) The Court, however, finds, as a matter of law, that Plaintiffs could prove no set of facts consistent with these allegations to support their assertion that Defendant's additional inspection requirements would in any way reduce highway safety. The Court notes that, with respect to inspections, the RFI actually states, in pertinent part, the following:

> Annual Inspection: Members of the Guilford County Schools Transportation Department shall be allowed to inspect

the carrier prior to initial approval for contracts and annually thereafter to ensure the company is dedicated to safety and passenger concerns and to review any paper work it [sic] deems important.

. . . .

[T]he carrier must also agree to ... [a]llow a site visit by the Guilford County Schools Transportation Department to review vehicle maintenance facilities and practices and vehicle records.

(RFI at 2, 3.) There are no allegations in Plaintiffs' Complaint or any indication in the RFI itself that Defendant seeks to perform its inspections in lieu of the federally mandated inspections, and thus no reasonable inference can be drawn from the Complaint or the RFI that Defendant's RFI would actually decrease safety.

Furthermore, a close reading of *Specialized Carriers* and its progeny reveals that "only if compliance with both federal and [state] regulations were impossible would preemption occur." *Interstate Towing*, 6 F.3d at 1162; *see id.* at 1162 n. 7 (stating that "[w]e find support for our conclusions in the Fourth Circuit case of *Specialized Carriers* "). In fact, the court of appeals in *Specialized Carriers* noted that, with the enactment of § 31141,[15] "[it] is obvious ... that Congress never intended preemption to apply to any State statute or regulation, the implementation of which would be compatible with the implementation of a federal regulation ...." *Specialized Carriers*, 795 F.2d at 1158. Not surprisingly, Plaintiffs have not directed this Court to

any case finding a state safety regulation to be preempted by the FMCSR.[16] In the present case, the Court finds that the RFI is not incompatible with the FMCSR, that is, compliance with the RFI would in no way prevent compliance with the FMCSR. Therefore, the RFI does not conflict with federal law. Because the RFI does not conflict with federal law, Plaintiffs' claims of conflict preemption fail as a matter of law.

For the foregoing reasons, therefore, the Court finds that the RFI is not preempted on any basis by federal law. Consequently, Plaintiffs' Supremacy Clause claims are dismissed. Having disposed of Plaintiffs' Supremacy Clause claims, the Court will now address Plaintiffs' claims under the Commerce Clause.

2. Commerce Clause

■■■ Plaintiffs Carolina American and NCMA both contend that the RFI violates the Commerce Clause because it places an undue burden on interstate commerce. The Commerce Clause provides that "Congress shall have Power ... [t]o regulate Commerce ... among the several States ...." U.S. Const. art I, § 8, cl. 3. "Supreme Court precedent has long recognized that although phrased as a grant of regulatory power to Congress, the Commerce Clause inherently 'denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce.'" *Waste Mgmt.*

---

**15.** The Court notes that although the predecessor to § 31141 had been enacted at the time *Specialized Carriers* was decided, it had not yet gone into effect.

**16.** The Court notes that Plaintiffs' citation of *Greyhound Lines, Inc. v. Bond*, 725 F.2d 455, 456 (8th Cir.1984), for the proposition that "[a]t least one court has held that the FMCSR preempts state and local regulations in certain circumstances" is unpersuasive. (Pls.'

Br. Opp. Def.'s Mot. Dismiss at 18 n. 13.) Although the district court in *Greyhound Lines* had found the state regulation preempted under the FMCSR, the Eighth Circuit Court of Appeals specifically declined "to decide whether the [state] statute [was] preeempted by the federal laws relied upon by the District Court ...." *Greyhound Lines*, 725 F.2d at 456 n. 4.

*Holdings, Inc. v. Gilmore,* 252 F.3d 316, 333 (4th Cir.2001) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994)). Plaintiffs bring their Commerce Clause claims under this negative aspect of the Commerce Clause, which is known as the "dormant Commerce Clause." *See id.*

■ Defendant contends, however, that Plaintiffs' Commerce Clause claim must fail because of what is known as the "market participant exception." Under this exception, state activity does not offend the Commerce Clause where the state is acting as a market participant rather than a market regulator. As the Supreme Court explained in *Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), "the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace. There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market." *Id.* at 436–37, 100 S.Ct. at 2277 (citations omitted). Thus, "[u]nder the market participant doctrine, 'a state acting in its proprietary capacity as a purchaser or seller may favor its own citizens over others.'" *Waste Mgmt.,* 252 F.3d at 345 (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.,* 520 U.S. 564, 592–93, 117 S.Ct. 1590, 1606, 137 L.Ed.2d 852 (1997) (internal quotation marks omitted)). Absent "'direct state involvement in the market,' however, the strictures of the dormant Commerce Clause apply with full force.'" *Id.* (quoting *Camps Newfound/Owatonna, Inc.,* 520 U.S. at 593, 117 S.Ct. at 1607).

■ The core disagreement between Plaintiffs and Defendant with respect to the application of the market participant exception is whether Defendant acted as a regulator or as a market participant. Plaintiffs contend that Defendant acted a regulator because its "procedures bound the public schools in Guilford County and prevented them from entering into contracts with members of plaintiff association." (Pls.' Br. Opp. Def.'s Mot. Dismiss at 15.) Plaintiffs therefore contend that "the Guilford County public schools ... are third parties who may enter into contracts for motorcoach transportation services independently of defendant." (*Id.* at 12.) Defendant contends, however, that North Carolina law is clear that the individual public schools in Guilford County are "nothing more than ... building[s] at which the school board provides education." (Def.'s Br. Supp. Mot. Dismiss & Strike at 8.) Therefore, Defendant contends that it is Defendant itself which has the ultimate contractual relationship with Carolina American and other motor carriers for motorcoach transportation services.

To determine whether Defendant itself had the ultimate contractual relationship with the motor carriers, it is necessary for the Court to review the local structure of public education in North Carolina. Chapter 115C of the General Statutes of North Carolina governs North Carolina's system of public education. Although the North Carolina Constitution requires the State of North Carolina to provide a "sound basic education," because the State is unable to attend to the day-to-day operation of each public school in the state, the State delegates decisionmaking authority to 117 local school administrative units. *See Leandro v. North Carolina,* 346 N.C. 336, 345, 488 S.E.2d 249, 254 (1997) (citing N.C. Const. art. I, § 15); Laurie L. Mesibov, *Local Boards of Education, in Education Law in North Carolina* [hereinafter *ELNC*], § 300 (Janine M. Murphy ed., 2001). A local school administrative unit (or "administrative unit") is "a subdivision of the

[North Carolina] public school system which is governed by a local board of education." N.C. Gen.Stat. § 115C–5(6). An administrative unit is classified as either a county school administrative unit or a city school administrative unit. *See id.* § 115C–66. Each of North Carolina's 100 counties (e.g., Guilford County) is "classified as a county school administrative unit, the schools of which . . . shall be under the general supervision and control of a county board of education with a county superintendent as the administrative officer." *See id.* In addition, although not relevant to this cause of action, there are also seventeen city school administrative units. N.C. Dep't Pub. Instruction, *2002–03 Facts & Figures, North Carolina Public Schools,* http:// www.ncpublicschools.org/fbs/facts-figs0203.pdf (last visited Apr. 22, 2004). Furthermore, the General Statutes of North Carolina also provide for school districts. A "district" is narrowly defined as "any convenient territorial division or subdivision of a county, created for the purpose of maintaining within its boundaries one or more public schools." N.C. Gen. Stat. § 115C–69; *see Floyd v. Lumberton City Bd. of Educ.,* 71 N.C.App. 670, 674–75, 324 S.E.2d 18, 22–23 (1984); *Hobbs v. County of Moore,* 267 N.C. 665, 675, 149 S.E.2d 1, 7–8 (1966). Districts are "under the control of the local board of education." N.C. Gen.Stat. § 115C–69. The General Statutes also provide for school systems (e.g., Guilford County Schools). "The school system of each local school administrative unit shall consist of 12 years of study or grades, and shall be graded on the basis of a school year of not less than nine months. Schools within the system may be organized in the discretion of the local board of education." *Id.* § 115C–74. Finally, the General Statutes recommend (but do not require) that the local boards of education classify public schools with the following grade levels: elementary schools (K–8); high schools (9–12); junior high schools (7–9); middle schools (6–9); senior high schools (10–12); union schools (K–12). *See id.* § 115C–75.

Particularly relevant to this case, therefore, is the legal status of the entities involved. Although administrative units and school systems are political subdivisions of the State of North Carolina, they lack capacity to sue or be sued, and they are under the control of their respective local boards. *See id.* §§ 115C–66, –74; *Wilson v. McDaniel,* No. C–89–815–WS, 1991 WL 32247, 1991 U.S. Dist. LEXIS 5131, at *3–4 (M.D.N.C. Jan.14, 1991) (dismissing Winston–Salem/Forsyth County Schools as a defendant because, as a public school system, it lacked capacity to be sued). In the present case, Defendant is the local board of education that has control over public instruction in Guilford County. Under North Carolina General Statutes section 115C–36,

> All powers and duties conferred and imposed by law respecting public schools, which are not expressly conferred and imposed upon some other official, are conferred and imposed upon local boards of education. Said boards of education shall have general control and supervision of all matters pertaining to the public schools in their respective administrative units and they shall enforce the school law in their respective units.

Section 115C–40 further provides, in pertinent part, as follows:

> The board of education of each county in the State shall be a body corporate . . ., and the board of education of each city administrative school unit in the State shall be a body corporate . . . . The several boards of education, both county and city, shall hold all school property and be capable of purchasing and holding real and personal property, of build-

ing and repairing schoolhouses, of selling and transferring the same for school purposes, and of prosecuting and defending suits for or against the corporation.

Local boards of education, subject to any paramount powers vested by law in the State Board of Education or any other authorized agency shall have general control and supervision of all matters pertaining to the public schools in their respective local school administrative units[, and] they shall execute the school laws in their units ....

Thus, "except for powers specifically given to the State Board of Education or other authorized agency, the local board has authority over all public school matters in its administrative unit." Mesibov, *supra*, § 301. In addition, the Court notes that all public school employees in Guilford County are by definition employees of Defendant Guilford County Board of Education, not the local schools where they work. *See* Robert P. Joyce, *The Law of Employment in North Carolina's Public Schools* 3 (2000) (stating that "[e]very person employed in North Carolina's public schools—other than charter schools—is an employee of a local board of education" (footnote omitted)) (citing N.C. Gen.Stat. §§ 115C–276(j), –315(b)).

Notwithstanding the weight of authority to the contrary, Plaintiffs still contend that Carolina American and NCMA's other motor-carrier members actually entered into contracts with individual public schools (e.g., Kiser Middle School) in Guilford County, not Defendant Guilford County Board of Education. Nowhere in Chapter 115C, however, has the North Carolina legislature given individual public schools a separate legal existence, much less the

power to enter into contracts. In fact, "[i]n North Carolina, Chapter 115C of the General Statutes gives *local school boards and officials* implied authority to contract and specific authority to contract for certain purposes." Frederick G. Johnson, *Contracts, in ELNC*, § 1001.A (emphasis added). In support of their position that the individual schools are legal entities, however, Plaintiffs rely on the case of *Community Projects for Students v. Wilder, Inc.*, 60 N.C.App. 182, 298 S.E.2d 434 (1982). *Wilder*, however, is inapposite. In *Wilder*, a teacher arranged to buy supplies from a merchant. When the merchant did not receive full payment, the merchant sued the teacher, the school (Northern Nash Senior High School), and the school board. Prior to trial, Northern Nash Senior High School was dismissed as a party defendant under North Carolina Rule of Civil Procedure 12(b)(6). At the close of the plaintiff's evidence, the trial judge directed a verdict for the school board because there was no evidence of a contract between the school board and the plaintiff.

In their brief, Plaintiffs characterize *Wilder* as holding "that a contract between a public school and a merchant for the purchase of fundraising supplies did not constitute a contract between the county school board and the merchant or otherwise bind the school board"; thus, Plaintiffs contend that a public school must have a legal existence separate from a school board. (Pls.' Br. Opp. Def.'s Mot. Dismiss at 11–12.) Plaintiffs, however, misconstrue *Wilder*. First, the high school was dismissed from the case on a 12(b)(6) motion, presumably because it lacks an independent legal existence.[17] In addition, a directed verdict was granted for the school board because the evidence

17. The plaintiff in *Wilder* did not appeal the trial judge's dismissal of Nash Senior High School from the case.

failed to show, as a matter of law, that the teacher had express, implied, or apparent authority to enter into the contract on behalf of the school board or that the school board had ratified the contract. As the North Carolina Court of Appeals noted, "[u]nder the system of public education in this state, local school boards alone have the duty or authority to enter into or authorize purchases of supplies and equipment for the respective local school systems." *Wilder*, 60 N.C.App. at 183, 298 S.E.2d at 435 (citing former N.C. Gen.Stat. § 115-52, *recodified as amended* at N.C. Gen.Stat. § 115C–522(a)); *see also* N.C. Gen. Stat § 115C–47(23) (stating that "local boards of education shall have the power or duty . . . [to] contract for equipment and supplies under G.S. 115C–522(a))." In this case, however, sections 115C–47(23) and 115C–522(a) do not apply because motorcoach services are not "supplies, equipment [or] materials." *See* § 115C–522(a); Frayda S. Bluestein, *Purchasing, in ELNC*, § 1402.B.1 (stating that while no case law has defined "supplies, equipment, [and] materials," a comparison to similar terms in other statutes indicates that "supplies, equipment, [and] materials would be tangible personal property" (emphasis omitted)). Even though the power to contract for motor-carrier services is not expressly conferred on the local boards of education, such power is implied from the provisions of Chapter 115C. *Cf. North Carolina ex rel. N.C. Utils. Comm'n v. McKinnon*, 254 N.C. 1, 11, 118 S.E.2d 134, 141 (1961) (holding that because N.C. Gen. Stat. § 115–35(4) (recodified as amended at § 115C–47(4)) gives school boards control over extracurricular activities, school boards "would have the inherent right to contract for such transportation as might be necessary" for these activities); *see also* Johnson, *supra*, § 1001.A (reasoning that "[a]uthority to make other contracts that may be necessary in the daily operation of the public schools can be reasonably implied from G.S. 115C–47(1), which makes local boards of education responsible for providing an adequate school system)."

Plaintiffs therefore have cited no case law or statute giving individual public schools a separate legal existence and/or the authority to enter into contracts, and this Court can locate none. In their Complaint, however, Plaintiffs continuously allege that the contracts were between the motor carriers and the schools. (*See, e.g.,* Compl. ¶¶ 24, 25.) At the Motion Hearing, Plaintiffs' attorney argued, based on the allegations of Plaintiffs' Complaint, that the Court could not hold, as a matter of law, that the motorcoach contracts were between Defendant (as opposed to the individual schools) and the motor carriers. Plaintiffs' attorney explained the contracting process as follows: "a teacher or a principal calls up the motorcoach carrier, places an order and a contract is engaged. A confirmation is sent and the contract is signed by the teacher from the middle school. Nowhere on these two pieces of paper that constitutes [sic] the contract between the school and the motorcoach carrier contains [sic] the name of the Guilford County Board of Education." (Mot. Hr'g Tr.) The Court finds, however, that Plaintiffs' contentions are without merit. As a matter of law, teachers and principals in the Guilford County schools are employed by Defendant Guilford County Board of Education, not the individual public schools in Guilford County. *See* Joyce, *supra*, at 3. The only entity with authority to contract is Defendant, or officials or employees to whom Defendant has delegated that authority. *See Johnson, supra*, § 1001.A (noting that school administrative units have no inherent authority to contract and the legislature has given authority to contract to "local school boards and officials"). Thus, to the extent

that Plaintiffs contend that they entered (or seek to enter) into contracts to transport Guilford County schoolchildren, these contracts would be, by definition, with the Guilford County Board of Education, not with any individual public school in Guilford County.[18] Therefore, Defendant did not issue the RFI to regulate the conduct of others, but instead to inform prospective motor carriers how Defendant will participate in the motor carrier market. Accordingly, Defendant is acting "in its proprietary capacity as a purchaser," *Waste Mgmt.*, 252 F.3d at 345 (internal quotations omitted), and the market participant exception applies to prevent Defendant's RFI from coming within the purview of the Commerce Clause.[19] Plaintiffs Carolina American and NCMA's Commerce Clause claims are therefore dismissed with prejudice.

## C. State–Law Claims

Having dismissed Plaintiffs' federal claims, this Court may decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims, over which this Court does not have original jurisdiction. *See* 28 U.S.C. § 1367(c)(3). The Court, however, finds that it is appropriate to decide Plaintiffs' state-law claims because these claims are closely related to Plaintiffs' federal claims. As discussed above, Carolina American brings two interrelated claims under North Carolina law: tortious interference with contract and tortious interference with prospective economic advantage.[20] In addition, Carolina American seeks punitive damages from Defendant based on these claims. Defendant contends, however, that Carolina American's tortious-interference claims fail as a matter of law. Defendant further contends that even if Carolina American has sufficiently alleged tortious-interference claims, Carolina American may not recover punitive damages from Defendant because Defendant is a governmental entity.

As the North Carolina Supreme Court held in *United Laboratories,*

---

**18.** The Court notes that neither NCMA nor Carolina American has brought a breach of contract claim against Defendant. Therefore, it is unnecessary for this Court to determine whether the school employees with whom Carolina American and other motor carriers allegedly entered into contracts actually had express, implied, or apparent authority to bind Defendant to these alleged contracts or, if not, whether Defendant ratified these alleged contracts. The Court is simply holding that Defendant, not the individual public schools in Guilford County, is the only entity that may contract for motor-carrier services; the Court is not determining whether any motor carriers actually had valid, enforceable contracts with Defendant.

**19.** Even assuming Plaintiffs were correct that the public schools in Guilford County are actually political subdivisions with an independent legal existence and the authority to contract, the market participant exception would still apply to shield Defendant from Plaintiffs' Commerce Clause claims. Following Plaintiffs' argument through to completion, each public school would be a political subdivision under the control of Defendant School Board. However, the market participant exception shields governmental entities from Commerce Clause scrutiny even where the governmental entity (here Defendant) "exercis[es] its power through smaller, localized units ...." *See Big Country Foods, Inc. v. Bd. of Educ.*, 952 F.2d 1173, 1179 (9th Cir.1992) (citing *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 911 (3d Cir.1990)); *accord Smith Setzer & Sons, Inc. v. S.C. Procurement Review Panel*, 20 F.3d 1311, 1318–20 (4th Cir.1994).

**20.** As discussed in Section II.D.2 above, the Court has dismissed Plaintiff NCMA's claims for tortious interference with contract and tortious interference with prospective economic advantage because the Court determined (and NCMA apparently concedes) that NCMA lacks standing to bring these claims because these claims are based upon a request for monetary damages on behalf of NCMA's motor-carrier members.

*Inc. v. Kuykendall*, 322 N.C. 643, 370 S.E.2d 375 (1988), a claim for tortious interference with contract is comprised of the following five elements:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person;

(2) the defendant knows of the contract;

(3) the defendant intentionally induces the third person not to perform the contract;

(4) and in doing so acts without justification;

(5) resulting in actual damage to plaintiff.

*Id.* at 661, 370 S.E.2d at 387. To make out a claim for tortious interference with prospective economic advantage, the plaintiff "must show that [the defendant] induced a third party to refrain from entering into a contract with [the plaintiff] without justification. Additionally, [the plaintiff] must show that the contract would have ensued but for [the defendant's] interference." *Daimlerchrysler Corp. v. Kirkhart*, 148 N.C.App. 572, 585, 561 S.E.2d 276, 286 (2002) (internal citation omitted) (citing *Cameron v. New Hanover Mem'l Hosp.*, 58 N.C.App. 414, 440, 293 S.E.2d 901, 917 (1982)).

Carolina American contends that when Defendant established the RFI, it forced the public schools to cancel their contracts with Carolina American and to not enter into any additional contracts with Carolina American unless Carolina American complied with the RFI. Thus, Carolina American bases its tortious-interference claims on the premise that the individual public schools (e.g., Kiser Elementary School, etc.) are separate legal entities capable of entering into contracts.

As discussed more fully in Section III.B.2 above, individual public schools are not legal entities that can enter into contracts. Therefore, based on the allegations in Carolina American's Complaint, Defendant Board is a party to these contracts (both the ones that were allegedly cancelled and any future motor-carrier contracts). Under North Carolina law, however, a plaintiff may not maintain a tortious-interference claim against a party to the contract. *See, e.g., Wagoner v. Elkin City Schs.' Bd. of Educ.*, 113 N.C.App. 579, 587, 440 S.E.2d 119, 124 (1994) (holding that the plaintiff could not maintain a claim for malicious (tortious) interference with contract against the defendant school board because the defendant was a party to the contract). Because Defendant is a party to the motor-carrier contracts, Carolina American's tortious-interference claims against Defendant fail as a matter of law. In addition, because the Court has dismissed Carolina American's tortious-interference claims, Carolina American's request for punitive damages is moot. Regardless, even if Carolina American had presented viable tortious-interference claims, the Court would still dismiss its request for punitive damages because Defendant Guilford County Board of Education is a governmental entity and therefore is immune from punitive damages.[21] *Ripellino v. N.C. Sch. Bds. Ass'n*, 158 N.C.App. 423, 431, 581 S.E.2d 88, 94 (2003) (holding that the Johnston County Board of Education, "as a governmental entity, [was] immune from punitive damages"), *cert. denied*, 358 N.C. 156, 592 S.E.2d 694 (2004).

## IV. CONCLUSION

For the foregoing reasons, therefore, Defendant's Rule 12(b)(1) Motion is denied

---

21. The Court notes that to the extent that Plaintiff NCMA requested punitive damages, its request was also based on its tortious-interference claims, which the Court has dismissed for lack of standing.

with respect to all of Carolina American's claims. Accordingly, Carolina American has standing to pursue its claims in this Court. Defendant's 12(b)(1) Motion against NCMA is granted, however, with respect to NCMA's claims for monetary damages. Thus, to the extent that NCMA seeks monetary damages with respect to any of its claims, its claims for monetary damages are dismissed. Furthermore, because NCMA's tortious-interference claims are solely for monetary damages, NCMA's tortious-interference claims are hereby dismissed in their entirety because NCMA lacks standing to bring these claims.[22] Notwithstanding the Court's determination that Carolina American and NCMA have standing with respect to certain claims they have asserted, for the reasons stated herein the Court finds merit to Defendant's Rule 12(b)(6) Motion to Dismiss Carolina American's and NCMA's claims. Therefore, Defendant's 12(b)(6) Motion against Carolina American is granted in all respects, and all of Carolina American's claims are therefore dismissed with prejudice. In addition, Defendant's 12(b)(6) Motion against NCMA is granted with respect to all of Defendant's claims over which this court has subject matter jurisdiction, that is, NCMA's claims under the Supremacy Clause and the Commerce Clause, as well as its abandoned claim pursuant to North Carolina General Statutes sections 66–58(c)(9a) and 115C–247. These claims are therefore dismissed with prejudice. Finally, Defendant's Rule 12(f) Motion to strike the punitive-damages claims from Plaintiffs' Complaint is denied as moot because the Court has already

dismissed both Plaintiffs' punitive-damages claims. *See Freedlander v. Edens Broad., Inc.*, 734 F.Supp. 221, 223 (E.D.Va.1990) (denying the defendant's 12(f) motion to strike plaintiffs' claim for punitive damages as moot because the court had dismissed plaintiffs' complaint pursuant to Rule 12(b)(6)).

---

**22.** Although the Court has dismissed NCMA's tortious-interference claims pursuant to Rule 12(b)(1) because NCMA lacks standing to bring these claims, the Court notes that even if NCMA had standing to bring its tortious-interference claims, the Court would dismiss NCMA's tortious-interference claims pursuant to Rule 12(b)(6) for the same reasons the Court has dismissed Carolina American's tortious-interference claims, that is, tortious-interference claims may not be maintained against Defendant because Defendant is actually a party to the contracts related to those claims.